[No. S004813. May 3, 1990.]

ADRIAN BERNARDO GARCIA, JR., et al., Petitioners, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY,
Respondent;
THE STATE OF CALIFORNIA et al., Real Parties in Interest.

## COUNSEL

Garry, McTernan, Stender, Walsh & Schwartzbach, McTernan, Stender, Walsh & Schwartzbach, McTernan, Stender & Walsh, Cliff Weingus and Brian C. Walsh for Petitioners.

No appearance for Respondent.

John K. Van de Kamp, Attorney General, Marvin Goldsmith, Assistant Attorney General, Tyler Pon and Wayman M. Robertson, Jr., Deputy Attorneys General, for Real Parties in Interest.

Gerrit Jan Buddingh and Jacqueline A. Campbell as Amici Curiae on behalf of Real Parties in Interest.

## OPINION

**PANELLI, J.**—Napoleon Johnson, Jr., a convicted murderer on parole, kidnapped and killed Grace Morales. Plaintiffs, the victim's children, have sued the State of California (State) and Johnson's parole officer for wrongful death and violation of the Civil Rights Act of 1871. (42 U.S.C. § 1983.) In their first amended complaint, plaintiffs alleged that the parole officer, Michael Ybarra, knew that Johnson had threatened to kill Morales but nevertheless told her that the parolee would "not come looking" for her. The superior court sustained demurrers by Ybarra and the State without leave

to amend.[1] The Court of Appeal denied plaintiffs' petition for a writ of mandate. We affirm the Court of Appeal's holding that plaintiffs have not stated a cause of action and the dismissal of plaintiffs' purported cause of action under the Civil Rights Act. However, we hold that plaintiffs should have leave to amend to allege a cause of action for negligent misrepresentation involving a risk of physical harm.

## I. FACTS

Our only task in reviewing a ruling on a demurrer is to determine whether the complaint states a cause of action. Accordingly, we assume that the complaint's properly pleaded material allegations are true and give the complaint a reasonable interpretation by reading it as a whole and all its parts in their context. (*Phillips* v. *Desert Hospital Dist.* (1989) 49 Cal.3d 699, 702 [263 Cal.Rptr. 119, 780 P.2d 349]; *Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) For these purposes we briefly summarize the complaint's pertinent allegations.

According to the first amended complaint, Johnson went to prison in 1974 for the murder of his wife. In August 1985, when he was released on parole, Ybarra became his parole agent. While on parole, Johnson "began a romantic relationship and cohabited with" Morales. In March 1986, when Morales moved out of Johnson's home, he "began a campaign of violence, intimidation and harassment directed at [her], which included attempted stabbings, repeated death threats at knife point, forced sexual relationships at knife point and false imprisonment."

When Ybarra learned that Johnson had threatened Morales's life, the parole officer met with Morales "in the presence of Johnson to inquire regarding the alleged threats." Johnson denied the threats, and Ybarra initially "concluded that the threats had not been made." But Johnson repeated his threats about a week later, telling Ybarra that "he was looking for [Morales]" and that "[he would] kill her if [he] found her." At this point, Ybarra concluded that Johnson was dangerous and placed him in 72 hours' custody for psychiatric observation. Upon Johnson's release, Ybarra

---

[1] Two additional defendants are not parties to this appeal. These are the County of Santa Clara and the Santa Clara Valley Medical Center, a county hospital where Johnson was temporarily confined for psychiatric observation. Plaintiffs allege that the county and its hospital are liable because the hospital's staff failed to inform Morales of threats that Johnson made against her during his confinement.

Plaintiffs have also alleged that the State is liable because a psychologist in its employ failed to warn Morales of threats by Johnson. The superior court overruled the State's demurrer to this cause of action, and this ruling is not before us.

"instructed [him] to engage in [further,] intensive treatment with the parole department's staff psychologist."

While Johnson was undergoing psychiatric treatment, an attorney who was representing Morales in a child custody proceeding attempted to obtain information from Ybarra about Johnson's prior murder conviction. The attorney told Ybarra "that she was applying for a temporary restraining order." Ybarra "refused to tell [the attorney] the nature of the crime,[2] but advised her that the crime committed was not of the type which would indicate that Johnson represented a danger to [Morales's] children." However, Ybarra "was still of the opinion that Johnson was very jealous and potentially violent," and he told Morales's attorney that he would serve the temporary restraining order and arrest Johnson.

Later, however, Ybarra apparently changed his mind. At some point "he telephoned decedent in an attempt to reconcile the relationship [*sic*] between Johnson and [Morales]." The subject of the telephone conversation was death threats. Morales told Ybarra what she feared: "Johnson knew where [she] was living" and "still intended to physically harm her." However, Ybarra told Morales: "I don't think you have anything to worry about. He's not going to come looking for you."[3] "Ybarra further assured [Morales] of her safety by emphasizing to her that Johnson had told him that he was still in love with [Morales], and repeatedly asking her if she really wanted to end the relationship."

Plaintiffs do not allege, however, that Morales believed Ybarra or actually and reasonably relied on his assurances. Instead, plaintiffs conclude their pleading with this general allegation of causation: "As a proximate result of the foregoing statements by Ybarra to decedent and the failure of psychologists and medical personnel to advise her of the danger Johnson represented to her, [Morales] failed to take steps to protect herself from Johnson." Subsequently, "Johnson kidnapped and shot [her]."

---

[2] Plaintiffs do not specifically argue that Ybarra's refusal to provide such information was tortious. Indeed, state law made it a crime for Ybarra to disclose information about Johnson's criminal record. (See Pen. Code, §§ 11105.1 [state summary criminal history information; persons entitled to receive], 11142 [authorized person furnishing record or information to unauthorized person; misdemeanor].)

[3] The parties have informed us that the entire telephone conversation between Ybarra and Morales was tape-recorded. However, plaintiffs have included only a few statements from the conversation in their complaint.

## II. DISCUSSION

### A. *The State Law Claim*

In their first amended complaint, plaintiffs have labelled their claim under state law simply one for "wrongful death." The Court of Appeal held that plaintiffs had not stated a cause of action because their allegations did not establish that Ybarra occupied a "special relationship" with either Johnson or Morales. (See *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 433-435 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166].) However, the court's search for a special relationship was unnecessary. A special relationship is a prerequisite for liability based on a defendant's *failure to act.* (See *Tarasoff* v. *Regents of University of California, supra,* 17 Cal.3d at p. 435; see also Rest.2d Torts (1965) § 315.) In contrast, plaintiffs in this case assert that Ybarra is liable because his allegedly negligent representations about Morales's physical safety induced her to be less careful.[4] Accordingly, it is unnecessary to look beyond the ordinary rules that determine when misrepresentations are actionable.

Negligent misrepresentations involving a risk of physical harm are actionable under the circumstances described in the Restatement Second of Torts, *supra,* section 311. Under that section, "(1) One who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information, where such harm results [¶] (a) to the other . . . . [¶] (2) Such negligence may consist of failure to exercise reasonable care [¶] (a) in ascertaining the accuracy of the information, or [¶] (b) in the manner in which it is communicated." California courts, in holding that plaintiffs have stated causes of action for negligent misrepresentations causing physical harm, have relied both on section 311 (*Hanberry* v. *Hearst Corp.* (1969) 276 Cal.App.2d 680, 683-688 [81 Cal.Rptr. 519, 39 A.L.R.3d 173]) and on Civil Code section 1710, subdivision 2 (*Barbara A.* v. *John G.* (1983) 145

---

[4] In their first amended complaint, plaintiffs clearly distinguish between the liability of Ybarra, which is based on statements, and that of the medical personnel, which is based on a failure to act: "*As a proximate result of the foregoing statements by Ybarra to decedent* and the failure of psychologists and medical personnel to advise her of the danger Johnson represented to her, [Morales] failed to take steps to protect herself from Johnson." (Italics added.)

Plaintiffs may have attempted to state a cause of action for failure to act based upon the allegation that Ybarra failed to serve a temporary restraining order on Johnson or arrest him. However, neither allegation helps plaintiffs to state a cause of action. This is because plaintiffs do not allege that an order was actually furnished to Ybarra for service, and because Ybarra enjoys absolute statutory immunity for the failure to arrest Johnson. (Gov. Code, § 846; *City of Sunnyvale* v. *Superior Court* (1988) 203 Cal.App.3d 839, 842 [250 Cal.Rptr. 214]; cf. *Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197, 205-206, fn. 4 [185 Cal.Rptr. 252, 649 P.2d 894].) At oral argument, plaintiffs characterized these allegations as relevant to the existence of a special relationship rather than as independent grounds of liability.

Cal.App.3d 369, 375-376 [193 Cal.Rptr. 422]).[5] Scholars have also recognized the theory. (Prosser & Keeton on Torts (5th ed. 1984) ch. 5, § 33, at pp. 205, fn. 26, & 205-208.)

Accordingly, we examine whether plaintiffs have stated a cause of action for negligent misrepresentation involving a risk of physical harm. First, plaintiffs must allege that Ybarra had a duty to exercise reasonable care in giving Morales information about Johnson. As Prosser and Keeton have observed, "[i]n all cases of negligent misrepresentation . . . the circumstances must be such that the defendant is under a duty to the plaintiff to exercise reasonable care in giving the information, and that reliance upon what he says, with resulting danger, is reasonably to be expected." (Prosser & Keeton on Torts, *supra,* ch. 5, § 33, at p. 207.) In this context, "duty" and "reasonable reliance" are closely connected. The likelihood that one's statements about personal safety will be taken seriously is a primary factor in determining whether one has a duty to exercise care in making such statements. As the Restatement puts it, such a duty "extends to any person who, in the course of an activity which is in furtherance of his own interests, undertakes to give information to another, and knows or should realize that the safety of the person or others may depend on the accuracy of the information." (Rest.2d Torts, *supra,* § 311, com. b, at p. 106.)

Misrepresentations involving a risk of physical harm constitute an exception to the ordinary rule that "liability [for negligent misrepresentations] is imposed only on those who supply information for business purposes in the course of a business or profession." (See 5 Witkin, Summary of Cal. Law, *supra,* Torts, § 721, at p. 820.) The ordinary rule is based on the principle that, in financial matters, a plaintiff "cannot expect the defendant to exercise the same degree of care [in social meetings] as he would when acting in a business or professional capacity." (*Ibid.*) The misrepresentations in this case, of course, were not made in a financial context. However, the duty to use reasonable care in giving information applies more broadly when physical safety is involved. In cases "[w]here . . . the harm which results is bodily harm to the person, or physical harm to the property of the one affected, there may be liability for the negligence even though the information is given gratuitously and the actor derives no benefit from giving it."[6] (Rest.2d Torts, *supra,* § 311, com. c, at p. 107; see also *Barbara*

---

[5] Civil Code, section 1710, subdivision 2, is often cited as the statutory basis in California for the negligent misrepresentation cause of action. (See, e.g., *Barbara A.* v. *John G., supra,* 145 Cal.App.3d at pp. 375-376; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 721, p. 819.) The section defines one form of "deceit" as: "[t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true . . . ."

[6] Even in cases involving physical harm, however, "[t]he fact that the information is gratuitous may . . . affect the reasonableness of the other's reliance upon it in taking action." (Rest.2d Torts, *supra,* § 311, com. c, at p. 107.) For example, "[t]here may be no reasonable

*A.* v. *John G., supra,* 145 Cal.App.3d at pp. 375-376; *Connelly* v. *State of California* (1970) 3 Cal.App.3d 744, 752 [84 Cal.Rptr. 257] [finding causes of action for gratuitous negligent misrepresentations involving risks of physical harm].)

■    In view of Johnson's threats, did Ybarra have a duty to use reasonable care in giving Morales information about her personal safety? Ordinarily, of course, law enforcement personnel have no duty to *volunteer* information about released criminals under their supervision. (*Thompson* v. *County of Alameda* (1980) 27 Cal.3d 741, 749-758 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701]; *J. A. Meyers & Co.* v. *Los Angeles County Probation Dept.* (1978) 78 Cal.App.3d 309, 314-315 [144 Cal.Rptr. 186]; cf. *Davidson* v. *City of Westminster, supra,* 32 Cal.3d at pp. 201-209 [police officer has no duty to warn about possible violence by a suspect under surveillance].) Nevertheless, the absence of a duty to speak does not entitle one to speak falsely. Thus, we may approach the duty question in this case by asking whether a reasonable parole officer, having chosen for whatever reason to provide information to a potential victim about a parolee's dangerousness, "knows or should realize that [the listener's] safety . . . may depend on the accuracy of the information." (Rest.2d Torts, *supra,* § 311, com. b, at p. 106.) Since parole officers have statutory obligations to supervise parolees and expertise in doing so, a member of the public might reasonably believe that an officer who has chosen to discuss a parolee's dangerousness "purports to have special knowledge of the matter, or special reliability." (*Id.,* com. c, at p. 107.) Accordingly, we conclude that Ybarra, having chosen to communicate information about Johnson to Morales, had a duty to use reasonable care in doing so.

Second, plaintiffs must allege that Ybarra gave false information to Morales with a degree of culpability at least equal to negligence. Under Restatement Second of Torts, *supra,* section 311, "[s]uch negligence may consist of failure to exercise reasonable care (a) in ascertaining the accuracy of the information, or (b) in the manner in which it is communicated." Plaintiffs have met this requirement as a matter of pleading. To quote the complaint, Johnson had told Ybarra that "he was looking for [Morales] and that he would "kill [her] if [he] found her." Despite this knowledge, however, Ybarra allegedly told Morales that Johnson was "not going to come

justification for taking the word of a casual bystander, who does not purport to have any special information or any interest in the matter, as to the safety of a bridge or a scaffold, where the plaintiff would be fully justified in accepting the statement of one who purports to have special knowledge of the matter, or special reliability, even though the plaintiff knows that he is receiving gratuitous advice." (*Ibid.*)

looking" for her, and "further assured [her] of her safety by emphasizing to her that Johnson had told him that he was still in love with [her] . . . ." Solely as a matter of pleading, these allegations suffice to raise a question about whether Ybarra exercised due care in communicating to Morales what he knew about Johnson's threats.

Third, as in all cases for negligent misrepresentation, plaintiffs must allege facts sufficient to show that Morales actually and reasonably relied on the alleged misrepresentations.[7] The complaint, however, is deficient in this regard. In view of the very specific allegations that Morales was afraid of Johnson because of his past death threats and violent behavior towards her, the allegation that she "failed to take steps to protect herself from Johnson" does not suffice. "The court should not be required by conjecture to supply a necessary but missing allegation, which, if it had been made, would run counter to reasonable probability, even though it would have to be accepted as true for the purpose of testing the sufficiency of the complaint." (*Vice* v. *Automobile Club of So. Cal.* (1966) 241 Cal.App.2d 759, 764 [50 Cal.Rptr. 837].)

Finally, plaintiffs must allege that Morales's reliance on Ybarra's representations proximately caused her death. At present, plaintiffs have alleged that, "[a]s a proximate result of the foregoing statements by Ybarra to decedent and the failure of psychologists and medical personnel to advise her of the danger Johnson represented to her, [Morales] failed to take steps to protect herself from Johnson," who "kidnapped and shot [her]." This general allegation suffices as a matter of pleading solely on the issue of causation. As we have already noted, however, plaintiffs cannot establish a complete causal relationship between Ybarra's statements and Morales's death, and thus state a cause of action, without the further allegation that Morales actually and reasonably relied on Ybarra's statements about Johnson.

---

[7] A defendant is liable under the theory set out in the Restatement Second of Torts, *supra,* section 311, only "for physical harm caused by action taken by the other *in reasonable reliance* upon such information." (Rest.2d Torts, *supra,* § 311, subd. (1), italics added.) Under section 311, reliance is an element of the cause of action which must be both pled (*Dyson* v. *General Motors Corp.* (E.D.Pa. 1969) 298 F.Supp. 1064, 1066-1067; *Howard* v. *Poseidon Pools, Inc.* (1986) 133 Misc.2d 50 [506 N.Y.S.2d 523, 525], affd. in part and revd. in part on other grounds (1987) 134 App.Div.2d 926 [522 N.Y.S.2d 388]) and proved (*Kommanvittselkapet Harwi (R. Wigand)* v. *United States* (3d Cir. 1972) 467 F.2d 456, 459, cert den. (1973) 411 U.S. 931 [36 L.Ed.2d 391, 93 S.Ct. 1898]; *Baylie* v. *Swift & Co.* (1975) 27 Ill.App.3d 1031 [327 N.E.2d 438, 449]). A plaintiff must also plead reliance if the cause of action for negligent misrepresentation involving physical harm is viewed as one under Civil Code section 1710, subdivision 2. (*Barbara A.* v. *John G., supra,* 145 Cal.App.3d at pp. 375-376.)

At oral argument, counsel indicated that plaintiffs were willing to amend to state a cause of action for negligent misrepresentation. ■ ■ ■ ■ Plaintiffs are entitled to leave to amend because the lower courts did not address the theory on which we now rely.[8] (*Williams* v. *State of California, supra,* 34 Cal.3d 18, 28.)

## B. *The Federal Claim*

■ Plaintiffs have also attempted to state causes of action against the State and Ybarra under the Civil Rights Act of 1871 (42 U.S.C. § 1983; hereafter section 1983).[9] However, plaintiffs appear to be proceeding under the incorrect assumption that section 1983 simply federalizes all tort claims against state actors. In essence, petitioners merely incorporate their earlier allegations about Ybarra's "conduct" and add boiler-plate allegations of

---

[8] This case also raises issues of statutory immunity, which the superior court resolved in favor of the defendants. The court should reconsider these issues in the light of any new allegations. To address these issues before plaintiffs have stated a cause of action is premature. (*Davidson* v. *Westminster, supra,* 32 Cal.3d at pp. 201-202; see also *Williams* v. *State of California* (1983) 34 Cal.3d 18, 22 [192 Cal.Rptr. 233, 664 P.2d 137].)

For the superior court's guidance, we note that the statutory immunity from liability for misrepresentations (Gov. Code, §§ 818.8 and 822.2) does not apply to negligent misrepresentations involving a risk of physical harm. In *Johnson* v. *State of California* (1968) 69 Cal.2d 782 [73 Cal.Rptr. 240, 447 P.2d 352], the foster mother of a youth on parole from the California Youth Authority sued the state after the youth assaulted her. The plaintiff alleged, among other things, that "the parole officer had affirmatively misrepresented that the youth had no background of violence and no character traits suggesting violent actions in the future." (*Id.,* at p. 799.) We held that "[t]he parole officer's conduct, whether he expressed affirmative and false representations as to the youth's character or merely remained silent on this matter, does not warrant immunity under Government Code section 818.8 as a 'misrepresentation.' " (*Id.,* at p. 799, italics omitted.) We reached that conclusion because the Legislature, in enacting the immunity statute, intended to limit the immunity to cases involving misrepresentations of a financial or commercial character. (*Id.,* at p. 800; see 2 Sen. J. (1963 Reg. Sess.) p. 1889.)

The dissenting opinion misinterprets *Johnson* as holding that a plaintiff cannot recover damages for physical harm in an action for negligent misrepresentation. To the contrary, we held *only* that the immunity statute did not apply to misprepresentations causing physical harm; we *expressly held open the possibility* that the plaintiff would be able to state a cause of action based upon the parole officer's misrepresentation. To quote the opinion, "however we may choose to characterize the parole officer's failure to give adequate warnings to plaintiff, section 818.8 does not apply to this case." (*Id.,* at p. 800.) Indeed, there would have been no need to address the immunity statute's applicability unless it was anticipated that the plaintiff would state a cause of action based upon a misrepresentation. It should also be noted that the dissent's interpretation of *Johnson* as limiting damages recoverable in an action for negligent misrepresentation conflicts with Civil Code section 3333, which permits the plaintiff in a tort action to recover "the amount which will compensate for *all* the detriment proximately caused thereby . . . ." (Italics added.)

[9] Section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

recklessness, deprivation of life, official policy, and entitlement to attorney's fees.

Recent decisions of the United States Supreme Court make it impossible for these plaintiffs to state such a claim. In *Will* v. *Michigan Dept. of State Police* (1989) 491 U.S. __ [105 L.Ed.2d 45, 109 S.Ct. 2304], the court held that neither a state nor a state official acting in his official capacity is a "person" subject to suit under section 1983. (*Will, supra,* 491 U.S. __ [105 L.Ed.2d at pp. 53-58, at pp. 2307-2312].) Accordingly, plaintiffs may not recover under that section either from the State or from Ybarra in his capacity as parole officer. Nor is Ybarra liable to plaintiffs in his individual capacity. The Supreme Court's opinion in *DeShaney* v. *Winnebago County DSS* (1989) 489 U.S. 189 [103 L.Ed.2d 249, 109 S.Ct. 998] (*DeShaney*) makes it clear that a constitutional "deprivation" can only be caused by a person acting under color of state law. In this case, however, the actor who caused Morales's death was Johnson, not Ybarra.

The State's failure to prevent harm inflicted by a private actor does not give rise to a cause of action under section 1983. This is the teaching of *DeShaney*: "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." (*DeShaney, supra,* 489 U.S. at p. 200 [103 L.Ed.2d at p. 262, 109 S.Ct. at p. 1006].) "In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to protect his liberty interests against harms inflicted by other means." (*Ibid.*)

We cannot avoid this holding, as plaintiffs suggest, on the basis of Ybarra's involvement in Morales's affairs. The *DeShaney* court held that a substantially greater degree of state involvement did not give rise to a claim under section 1983.

The plaintiff in *DeShaney* was Joshua, a young boy who was severely beaten by his father and is now profoundly retarded as a result. The beating followed substantial involvement by the defendants, a county and its department of social services, in attempting to protect Joshua. At one point, based upon reports of child abuse by a physician, the county even removed Joshua from his father's custody. When the father agreed to cooperate by enrolling Joshua in preschool and by receiving counselling, the county returned the boy to the home where he had suffered abuse. Although medical personnel

reported further abuse, Joshua's caseworker took no more action. On monthly home visits the caseworker, herself, saw suspicious injuries on the boy's head and saw that his father was not complying with his agreement. On two visits the caseworker was told that Joshua was too ill to see her. But she continued to take no action, and the severe beating followed. Based on these facts the Supreme Court held that federal law did not provide relief.

The county's decision to return Joshua to his father's custody undeniably increased the risk of injury. However, the Supreme Court expressly held that it "does not alter the analysis" that "the State once took temporary custody of Joshua . . . , for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all . . . ." (*DeShaney, supra,* 489 U.S. at p. 201 [103 L.Ed.2d at p. 262, 109 S.Ct. at p. 1006].) If one questions whether Joshua, a young boy, was really "free[ ] to act on his own behalf" (*ibid.*), then that only proves the instant case. In a much more substantial sense Ybarra left Morales, a competent adult, free to take whatever measures she thought appropriate for her own protection, informed by her personal knowledge of Johnson and his threats and violence towards her.[10]

Plaintiffs argue that the decision in *Wood* v. *Ostrander* (9th Cir. 1989) 879 F.2d 583 (*Wood*), supports a different result. In *Wood,* however, unlike *DeShaney* and the case before us, the defendant physically limited the plaintiff's ability to act on her own behalf.[11] (Cf. *DeShaney, supra,* 489 U.S. at p. 200 [103 L.Ed.2d at p. 262, 109 S.Ct. at p. 1006].) The defendant, a Washington State Trooper, arrested a motorist for driving while intoxicated, confiscated the keys to his car, and then simply drove away, leaving his female passenger, the plaintiff, in a high crime area where she was picked up by another driver and raped. (*Wood, supra,* 879 F.2d at p. 586.) By depriving the plaintiff of transportation in a high crime area, the defendant left her

[10] Plaintiffs theorize that Ybarra's bad advice restricted Morales's psychological freedom to protect herself. But this speculative theory of causation is far too attenuated to support liability under section 1983. Federal law, not state law, determines the closeness of the casual connection that must exist between state action and the alleged deprivation. A "remote" causal connection does not suffice. (*Martinez* v. *California* (1980) 444 U.S. 277, 285 [62 L.Ed.2d 481, 489, 100 S.Ct. 553].) The Seventh Circuit has made the point more forcefully: "The states are free in the administration of their own tort law to attenuate the requirement of causation as far as they want, even to the point . . . of eliminating it entirely; but deprivation in the constitutional sense requires more than a minimal or fictitous causal connection between the action of the state and the injury of the plaintiff." (*DeShaney* v. *Winnebago County DSS* (7th Cir. 1987) 812 F.2d 298, 302-303, affd. (1989) 489 U.S. 189 [103 L.Ed.2d 249, 109 S.Ct. 998].)

[11] In addition, *Wood* was argued *before* the Supreme Court's decision in *DeShaney,* which received only a passing reference in the Court of Appeals's opinion. (*Wood, supra,* 879 F.2d at p. 590.) The dissent in *Wood* argues that the majority opinion does not reflect *DeShaney*'s recent change in the law. (*Wood, supra,* 879 F.2d at pp. 597-600 (Carroll, J., dis.).)

in a much worse position than before, having substantially limited her ability to protect herself. In contrast, Ybarra left Morales in the same position as before, still free to take any measures she wished to protect herself from Johnson.

If the result that *DeShaney* compels in this case seems harsh, it is important to remember that our mandate changes when we interpret section 1983. When we interpret that statute, we deal not with the redress of private wrongs but with the allocation of lawmaking power between the federal and state governments. "A State may, through its courts and legislatures, impose such affirmative duties of care and protection upon its agents as it wishes." (*DeShaney, supra,* 489 U.S. at p. 202 [103 L.Ed.2d at p. 263, 109 S.Ct. at p. 1007].) But the power to impose such duties does not derive from section 1983. "[N]ot 'all common-law duties owed by government actors were . . . constitutionalized by the Fourteenth Amendment.' " (*DeShaney, supra,* 489 U.S. at p. 202 [103 L.Ed.2d at p. 263, 109 S.Ct. at p. 1007], quoting *Daniels* v. *Williams* (1986) 474 U.S. 327, 335 [88 L.Ed.2d 662, 671, 106 S.Ct. 662].)

### III.   CONCLUSION

The decision of the Court of Appeal is affirmed insofar as it holds that plaintiffs have not stated a cause of action and dismisses the purported cause of action under 42 United States Code section 1983. The decision is reversed insofar as it denies leave to amend. Accordingly, the case is remanded to the Court of Appeal, which shall vacate its order denying the petition for a writ of mandate. The Court of Appeal shall also enter a new order granting the petition and directing the superior court to vacate its judgment of dismissal and grant plaintiffs leave to amend to state a cause of action for negligent misrepresentation involving a risk of physical harm.

Lucas, C. J., Eagleson, J., and Kennard, J., concurred.

**LUCAS, C. J.,** Concurring.—The majority holds the facts alleged in the complaint may state a cause of action for "negligent misrepresentation," as defined in the Restatement Second of Torts, section 311, but implicitly holds plaintiffs are precluded from stating a cause of action for "mere" or "regular" negligence. The dissent, quoting language from venerable commentators, asserts that for decades courts have upheld judgments predicated on regular negligence liability in cases of physical injury resulting from negligent misrepresentations, and have not required the plaintiff to meet the more demanding requirement of section 311, i.e., that he prove his "reasonable reliance" on the defendant's representation. Because I believe the dis-

sent misstates the common law rule that it would perpetuate, and because the majority neither responds, nor sets forth the history of section 311, I write separately to express my views.

The dissent finds support for its position in the statement in Prosser and Keeton on Torts (5th ed. 1984), section 33, at page 205, to the effect that " 'for the most part *cases of misrepresentation resulting in physical harm have been dealt with in an action for negligence.* ' " (Dis. opn., *post,* p. 751, italics added in dis. opn.) Similarly, it quotes 2 Harper et al., The Law of Torts (2d ed. 1986) section 7.6, page 403: " '[w]here misrepresentations entail the foreseeability of physical harm and such harm in fact results, *the ordinary rules of negligence have for some time been applied.* ' " (Dis. opn., *post,* pp. 751-752, italics added in dis. opn.) Whatever these statements may have been intended to convey, they do not stand for the proposition advanced by the dissent, i.e., that at common law a plaintiff's reasonable reliance on another's representation was irrelevant to stating a prima facie case for "negligence." In each case cited in support of the italicized proposition in the respective treatises, the court implicitly or expressly recognized a need for reasonable reliance by the plaintiff—or the reasonableness of the reliance is patent on the face of the opinion. (See Prosser & Keeton, *supra,* § 33, at p. 205, fns. 27-30; 2 Harper et al., *supra,* § 7.6, at pp. 403-404, fn. 1.) Moreover, in fact, *both treatises cite section 311 of the second Restatement in support of their italicized statements*—a seeming anomaly that the dissent conveniently ignores.

The historical development of the tort explains and supports the conclusion of the majority that reasonable reliance is and should be an element of the cause of action. In the late 1920's and early 1930's there was considerable debate about the nature of the emerging misrepresentation cause of action, and the limits that should be placed on such an action. (See, e.g., Bohlen, *Misrepresentation as Deceit, Negligence, or Warranty* (1929) 42 Harv.L.Rev. 733; Green, *Deceit* (1930) 16 Va.L.Rev. 749; Carpenter, *Responsibility for Intentional, Negligent and Innocent Misrepresentation* (1930) 24 (Ill.L.Rev. 749; Bohlen, *Should Negligent Misrepresentation Be Treated as Negligence or Fraud?* (1932) 18 Va.L.Rev 703; Green, *Innocent Misrepresentation* (1933) 19 Va.L.Rev. 242.)

On the basis of sparse and evolving case authority, in 1934 the drafters of the original Restatement of Torts adopted former section 311, which articulated a circumscribed rule under which certain persons whose business it is to give out information could be held liable for bodily harm resulting from a plaintiff's "expectable" reliance on their misrepresentations. Thereafter a "negligent misrepresentation" cause of action, based in part on the authority of section 311 and in part on preexisting common law, continued to

develop. In response to ongoing concern that there should be limits on liability for negligent misrepresentation (cf. Harper, A Treatise on the Law of Torts (1938) § 76, and in particular pp. 178 [emphasizing the need for justifiable reliance] and 181 [discussing the plaintiff's duty to exercise due diligence]), courts grafted onto the "negligence" action a "reasonable reliance" element. Accordingly, in two notable cases courts expressly declined to find liability for personal injuries because the plaintiff had failed to establish reasonable reliance on the defendant's representation. (See, e.g., *Holt* v. *Kolker* (1948) 189 Md. 636 [57 A.2d 287]; *Webb* v. *Cerasoli* (1949) 275 App.Div. 45, 48-50 (plur. opn.) & pp. 50-51 (conc. opn., asserting plaintiff barred by contributory negligence) [87 N.Y.S.2d 884], affd. mem. (1949) 300 N.Y. 603 [90 N.E.2d 64].)

This evolution of the common law was codified by the drafters of the second Restatement. In their Tentative Draft No. 5, issued in April 1960, the drafters revised former section 311 by, inter alia, inserting an express "reasonable reliance" condition. They also observed in their note to the American Law Institute that both *Holt, supra,* 189 Md. 636, and *Webb, supra,* 275 App.Div. 45, found absence of liability *on the ground that there was no justifiable reliance* . . . ." (Italics added.)[1]

Accordingly, it appears to me that the dissent—and the commentators on which it relies—misperceive the true state of the common law by asserting without qualification that actions for negligent misrepresentation have long been analyzed under simple "negligence" principles. In fact, as noted above,

---

[1] Nothing in the dissent's analysis of *Holt, supra,* 189 Md. 636, or *Webb, supra,* 275 App.Div. 45, convinces me that the drafters of the second Restatement erred in their interpretation or characterization of those decisions.

The dissent concedes, as it must, that the court in *Holt, supra,* 189 Md. 636, affirmed a directed verdict for the defendants *because plaintiff failed to state a prima facie case of reasonable reliance.* The appellate court concluded, "the alleged statements of [defendants] were such casual expressions of opinion as plaintiff was not entitled to rely upon under the circumstances." (*Id.,* at p. 640.)

Through selective quotations from *Webb, supra,* 275 App.Div. 45, the dissent suggests the plurality opinion in that case did not view the plaintiff's reasonable reliance as an element of his prima facie case. I believe, consistently with the apparent interpretation of the drafters of the second Restatement, that the *Webb* opinion did view reasonable reliance as an element of the plaintiff's case. After posing the question, "what then are the essential elements" for an action based on "negligent language?" (275 App.Div. at p. 49), the court listed four elements, the last of which was: "the relationship of the parties arising from contract or otherwise must be such that in morals and good conscience the one has the right to rely upon the other for information, and the other giving the information has a duty to give it with care." (*Id.,* at p. 50.) The opinion concluded, "Under these rules I fail to see how the relationship of the plaintiff and the defendants was such that in morals and good conscience the former had any right to rely on what he is shown to have overheard [defendant] to say, as information of a fact for the guidance of his conduct which brought him injury, or how plaintiff can be exonerated from contributory negligence as a matter of law." (*Ibid.*)

each of the prior cases in which recovery was allowed either recognized the plaintiff's reasonable reliance, or such reliance was clear from the facts. Conversely, when reasonable reliance has not been proved, recovery has not been allowed. The second Restatement did not alter this common law rule, but merely "codified" it; the majority opinion, by following the second Restatement, does not depart from the common law, but rather adheres to it.

I believe there are legitimate jurisprudential and policy reasons to require a plaintiff to plead and prove reasonable reliance when alleging that a negligently made misrepresentation resulted in physical injury. In such situations the plaintiff will often be in the best position, and have the final opportunity, to avoid any risk of harm. He must ultimately decide, based on his own assessment of the circumstances known to him, whether to act on the representations of the defendant. Moreover, a plaintiff will often be the party most capable of correctly evaluating a risk. Finally, fairness dictates that a plaintiff justify his reliance, and that the reliance be reasonable, lest the speaker incur liability out of all proportion to his culpability for careless speech. For these reasons I concur in the majority's election to adopt the second Restatement view of liability for negligent misrepresentation resulting in physical harm, to the exclusion of a "traditional" negligence action.[2]

Eagleson, J., concurred.

**MOSK, J.,** Dissenting.—Although it characterized Ybarra's "advice" as "clearly outrageous conduct," the Court of Appeal nevertheless held that the complaint fails to state a cause of action on three grounds: it is not plainly foreseeable that because of Ybarra's "ill advised" statements, Morales would be murdered; the causal connection between Ybarra's advice and Morales's death is too nebulous; and expanding the liability of parole officers would impose too heavy a burden on the community.

Underlying the foregoing grounds, each of which is demonstrably wrong or embodies an erroneous legal standard, appears to be the appellate court's fatalistic view that "in the less than two-week period that elapsed between Ybarra's conversation with Morales and her death, it is highly speculative to assume that she could have accomplished any improvement in her security. The frightening reality is that for one in Morales's position there is frequently nothing she can do to protect herself." The majority in essence adopt this view, although in a less obvious and objectionable form and, in affirming the lower court's holding, compound rather than correct its errors.

---

[2] As the majority notes (*ante*, p. 734, fn. 4), plaintiffs have not pleaded an action based on failure to warn, and we need not decide today whether such an action would be appropriate.

The most glaring of the majority's errors is their failure to abide by the traditional standards governing review of complaints on demurrer. For example, it is too well established to require citation that a plaintiff should plead only facts, not legal conclusions. By insisting that plaintiffs plead Morales's conduct was "reasonable," the majority violate this fundamental rule. They announce that "we cannot just assume that Morales did rely on Ybarra's reassurances," purportedly because the complaint specifically alleges that Morales was afraid of Johnson. But their conclusion is illogical and flies in the face of the basic principle that all reasonable inferences must be drawn in favor of the pleader. In fact, precisely because Morales was aware that Johnson was dangerous *before* Ybarra called her, we are compelled to infer that she must have relied on Ybarra's statements in choosing not to take steps to protect herself.

In addition to misapplying established law, the majority create new law that is ill-advised and potentially mischievous. Despite clear controlling precedent of this court and the painstaking efforts of commentators, the majority confuse misrepresentations resulting in physical injury with the common law tort of negligent misrepresentation. The latter is a distinct form of tort liability; its origins lie in the common law actions of fraud and deceit. Quite naturally, it shares with fraud and deceit the requirement that causes of action thereunder be pleaded with specificity. By contrast, negligent misrepresentation resulting in physical harm is not a separate tort and, as many commentators have taken pains to clarify, the rules of simple negligence apply.

The practical effect of the majority's error is negligible in this case; on remand, plaintiffs will simply add five words to the complaint and proceed.[1] I find it surprising that the majority would labor thus to overrule sub silentio a venerable opinion of this court and depart from the commentators simply to bring forth this procedural mouse. The opinion might create serious problems in future cases, however, because of the many differences between negligence and the common law tort of negligent misrepresentation. In addition to the special pleading requirement referred to above, negligent misrepresentation has a number of special limitations, derived from the rules governing fraud, in the areas of causation, damages and the class of plaintiffs entitled to recover. (See 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 721, pp. 819-821; compare Rest.2d Torts, § 311 with

---

[1] Plaintiffs will add the underscored words: "as a proximate result of [Ybarra's misstatements] to decedent, and in reasonable reliance thereon, [Morales] failed to take steps to protect herself from Johnson."

*id.*, § 552.) In addition, the defense of comparative negligence may not be raised to a cause of action for negligent misrepresentation.

The majority characterize the liability for negligent misrepresentation resulting in physical harm as "an exception" to the ordinary rule that liability for the common law tort of negligent misrepresentation is imposed only on those who supply information for business purposes. In doing so, the majority reveal a profound misunderstanding of the law. The fact is that negligent misrepresentations resulting in physical harm have been the basis for liability in negligence long before the distinct common law tort of negligent misrepresentation was developed. "The courts which impose liability for negligent misrepresentation in cases in which the injury is financial or economic rather than to person or property are merely extending to interests of economic, financial and business advantage a protection similar, though not identical, to that which has been for years given to interests in security of person and property." (Bohlen, *Should Negligent Misrepresentations Be Treated as Negligence or Fraud?* (1932) 18 Va.L.Rev. 703, 706.) Negligence is not an exception to negligent misrepresentation. And to the extent that the protection afforded by the law of negligence is "not identical" to the protection afforded by the law of negligent misrepresentation, the majority's error sows the seed of confusion.

I

According to the first amended complaint, Napoleon Johnson, Jr., was convicted of murdering his wife in 1973. He was released on parole in 1985 under the supervision of Michael Ybarra, a parole officer employed by the state. Johnson then began a romantic relationship and cohabited with Grace Morales. In March 1986 Morales moved out of Johnson's residence and he began a campaign of violence and harassment against her, including sexual intercourse at knife point and death threats.

After Ybarra learned that Johnson had threatened the life of Morales, the parole officer met with her in the presence of Johnson to ask about the alleged threats. Johnson denied making the threats, and Ybarra initially concluded that he had not made them. About a week later, however, on April 3, 1986, Johnson told Ybarra that he felt jealous, angry and abandoned, and that "he was looking for [Morales]." Johnson then said, "I'd kill [Morales] if I found her." The complaint alleges that Ybarra knew Johnson had killed his wife in a fit of jealousy over the breakup of their marriage. Ybarra committed Johnson to a medical facility under the provisions of the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 et seq.). After

Johnson was released, Ybarra instructed him to undergo intensive treatment with the parole department staff psychologist.

During this time an attorney, Marta Vides, was representing Morales in connection with custody proceedings involving her children. Vides learned of Johnson's violence and threats against Morales and, on April 9, 1986, she told Ybarra that Johnson had attempted to stab Morales, and that she intended to apply for a temporary restraining order to protect Morales from Johnson. Ybarra agreed to serve the order and arrest Johnson.[2]

Thereafter, in a telephone conversation Morales told Ybarra that Johnson knew where she was living and advised him that she thought Johnson still intended to physically harm her. "In spite of decedent's expressed fears," the complaint alleges, Ybarra replied, "I don't think you have anything to worry about. He's not going to come looking for you." He repeatedly asked her if she really wanted to end the relationship, and told her that Johnson had said he was still in love with her.

The complaint further alleges that as a proximate result of Ybarra's conduct, Morales "failed to take steps to protect herself from Johnson." One week later, Johnson kidnapped Morales and shot her to death. Her surviving children brought this lawsuit.

## II

The majority fault plaintiffs for failing to allege sufficient facts to show that their mother "actually and reasonably" relied on Ybarra's statements. The reasonableness of a plaintiff's conduct (or in this case, that of the plaintiffs' decedent) is not an element of a cause of action for negligence and is properly considered, if at all, as a matter of comparative negligence. (See part IV, *post*.) But even if reasonable reliance were an element of plaintiffs' cause of action, the facts alleged in the first amended complaint meet the pleading requirements. As the majority opinion itself correctly explains, "Since parole officers have statutory obligations to supervise parolees and expertise in doing so, a member of the public might *reasonably* believe that an officer who has chosen to discuss a parolee's dangerousness 'purports to have special knowledge of the matter, or special reliability.'" (*Ante*, at p. 736, italics added.) Yet ignoring the rule that the pleader is entitled to all reasonable presumptions and inferences, the majority appear to believe that Morales was unreasonable in relying, or did not in fact rely, on Ybarra's

---

[2] The complaint does not allege that a temporary restraining order was actually applied for or issued.

statements "[i]n view of the very specific allegations that Morales was afraid of Johnson because of his past death threats and violent behavior towards her." (*Ante,* at p. 737.)

Those allegations, however, do not detract from the aura of reliability surrounding Ybarra's statement. Ybarra told Morales that Johnson "would not come looking for you." This is not idle chitchat of an unconcerned bystander; it is a statement by a parole officer to a known victim of his parolee's violence on a matter of grave concern to the victim's safety. It is phrased not as an opinion but as an unconditional fact, and it implies knowledge of other, unstated facts—perhaps that "Johnson assured me he would not look for you" or that "I told Johnson if he threatened you again, I would take steps to revoke his parole." The majority are too readily convinced by Ybarra who in hindsight now declares, "I did not reasonably expect Morales to rely on my assurances." I am not convinced, but in any event that is a question for the jury.

### III

Negligence and negligent misrepresentation are different torts and to confuse the two, as the majority do today, is to ignore the lesson taught by this court in *Johnson* v. *State of California* (1968) 69 Cal.2d 782 [73 Cal.Rptr. 240, 447 P.2d 352] (*Johnson*), and by commentators. Negligence took shape as a separate tort in the early part of the 19th century. (See generally Prosser & Keeton on Torts (5th ed. 1984) § 28, p. 161.) Negligent misrepresentation was not actionable in this country until 1922 (*Glanzer* v. *Shepard* (1922) 233 N.Y. 236 [135 N.E. 275, 23 A.L.R. 1425]) and in England until 1963 (*Hedley Byrne & Co.* v. *Heller & Partners Ltd.* [1964] App.Cas. 465). The tort of negligence was designed to protect against harm to person and property (Prosser & Keeton, *op. cit. supra,* § 33, at p. 205); negligent misrepresentation is generally confined to injuries to pecuniary interests, such as sales and credit transactions (*ibid.*). "[T]he scope of liability for negligent misrepresentation is not as broad as in other fields of negligence, but is subject to certain important limitations derived from the rules governing intentional fraud." (5 Witkin, Summary of Cal. Law, Torts, *op. cit. supra,* § 721, at p. 819, italics omitted.) One of those rules—that the plaintiff must plead a cause of action for fraud with particularity—is the basis of the majority's error in this case (see part II, *ante*).

In *Johnson, supra,* 69 Cal.2d 782, the plaintiffs brought an action for personal injuries against the state, alleging that a placement officer of the California Youth Authority acted negligently by allowing a boy with homicidal tendencies to be placed in their home. The original complaint alleged

that the parole officer had affirmatively misrepresented that the youth had no background of violence, and defendant successfully demurred asserting the immunity provided by Government Code section 818.8 (section 818.8).[3] In holding that the trial court improperly sustained the demurrer, we explained, " 'many familiar forms of negligent conduct may be said to involve an element of "misrepresentation," in the generic sense of that word, but "[s]o far as misrepresentation has been treated as giving rise in and of itself to a distinct cause of action in tort, it has been identified with the common law action of deceit," and has been confined "very largely to the invasion of interests of a financial or commercial character, in the course of business dealings." ' . . . [¶] In short, *'misrepresentation,' as a tort distinct from the general milieu of negligent and intentional wrongs, applies to interferences with financial or commercial interest.* " (69 Cal.2d at p. 800, quoting *United States* v. *Neustadt* (1961) 366 U.S. 696, 711, fn. 26 [6 L.Ed.2d 614, 624, 81 S.Ct. 1294], italics added.)

Many cases have followed *Johnson.* In *Michael J.* v. *Los Angeles County Dept. of Adoptions* (1988) 201 Cal.App.3d 859 [247 Cal.Rptr. 504] (*Michael J.*), adoptive parents and an adoptee brought an action for negligence, fraud and personal injury against the county department of adoptions alleging that the defendant represented that the adoptee was completely healthy when in fact he suffered from a congenital degenerative nerve disorder. After quoting at length from Justice Tobriner's opinion in *Johnson,* the court explained that the adoption process is not a commercial transaction, such as leasing and purchasing property or contracting for a pension, and the allegedly negligent governmental entity engaged in that process was not entitled to immunity under section 818.8.

In *Bastian* v. *County of San Luis Obispo* (1988) 199 Cal.App.3d 520 [245 Cal.Rptr. 78] (*Bastian*), a newspaper photographer photographed an accident scene in which a driver was killed when he was thrown from his car. Unbeknown to the photographer, a deputy sheriff had discovered a vodka bottle lying in the area and placed it alongside the driver's body with the label facing up. After the photographer was sued by the driver's family and fired by the newspaper, he sued the county and the deputy sheriff for negligence and intentional misrepresentation. Relying on *Johnson,* the court concluded that "[m]isrepresentation or concealment is commonly a distinct cause of action only where the relationship between the parties is financial or commercial" (*id.* at p. 531), and held that section 818.8 did not shield the government entity from the photographer's cause of action for negligence.

---

[3] Section 818.8 provides, "A public entity is not liable for an injury caused by misrepresentation by an employee of the public entity, whether or not such misrepresentation be negligent or intentional."

In *Connelly* v. *State of California* (1970) 3 Cal.App.3d 744 [84 Cal.Rptr. 257] (*Connelly*), the plaintiff's marinas suffered extensive damage when rivers reached flood stage. He sued the state for negligence alleging that during the period of heavy rains, he periodically telephoned the state water resources department and was given inaccurate river height forecasts, which caused him to set his marina docks to float at too low a level. The court concluded that "although [the plaintiff] suffered a commercial loss in the sense that his business installations were damaged, the loss did not result from a commercial transaction between him and the state, nor from the state's interference with his commercial transactions. The complaint alleges a service gratuitously performed by the state in a negligent manner, resulting in physical damage to property. As there is no allegation of a tortious interference by the state with appellant's commercial activities within the rationale of *Johnson,* we conclude that section 818.8 does not apply to this case." (*Id.* at p. 752.)[4]

In all these cases, the plaintiffs alleged causes of action for negligence, not negligent misrepresentation. (*Michael J., supra,* 201 Cal.App.3d at p. 863; *Bastian, supra,* 199 Cal.App.3d at p. 533; *Connelly, supra,* 3 Cal.App.3d at p. 747 ["we are confronted with the threshold question whether appellant has stated a cause of action under the general laws of negligence"].) Once the courts determined that the plaintiffs were in fact not alleging an invasion of financial interests arising out of a commercial transaction, they followed the command of *Johnson* and held that section 818.8 immunity was inapplicable.[5]

---

[4] Another case (this without governmental defendants) standing for the proposition that misrepresentations outside the commercial and financial context are treated under the rules of general negligence is *Pamela L.* v. *Farmer* (1980) 112 Cal.App.3d 206 [169 Cal.Rptr. 282]. In that case, several girls allegedly were sexually abused by a neighbor. The neighbor's wife encouraged the girls' parents to allow the children to swim at her home under her husband's sole supervision by assuring the parents " 'that her husband would be there and the children would be perfectly safe.' " (*Id.* at p. 209.) She did so despite her knowledge that he intended to commit sexual acts on the girls. The plaintiffs sued the husband for assault and battery and the wife for negligence. In reversing a judgment on demurrer in favor of the wife, the Court of Appeal held that the wife, who by her own acts increased the risk of harm to the children, could be found to have unreasonably exposed the children to the harm perpetrated by her husband.

[5] The majority purport to follow *Johnson*'s holding that section 818.8 immunity does not apply to misrepresentations outside the financial or commercial context, but inexplicably fail or refuse to acknowledge the rationale underlying the holding. In as clear terms as possible, *Johnson* stated, " 'misrepresentation,' as a tort distinct from the general milieu of negligent and intentional wrongs, applies to intereferences with financial or commercial interest." (69 Cal.2d at p. 800.) Stated another way, misrepresentations outside the financial or commercial context are not actionable under the distinct tort of negligent misrepresentation; such nonfinancial misrepresentations are actionable under the general rules of "negligent and intentional wrongs."

It is true that during the first half of this century there was considerable controversy and confusion over the theory of negligent misrepresentation.[6] *Johnson* and its progeny put the confusion to rest. Modern commentators have unequivocally expressed the same view: that negligent misrepresentations resulting in physical injury are treated under the rules of simple negligence. As Dean Prosser explained, "A great many of the common and familiar forms of negligent conduct, resulting in invasions of tangible interests of person or property, are in their essence nothing more than misrepresentation, from a misleading signal by a driver of an automobile about to make a turn, or an assurance that a danger does not exist, to false statements concerning a chattel sold, or non-disclosure of a latent defect by one who is under a duty to give warning. . . . In all such cases the particular form which the defendant's conduct has taken has become relatively unimportant, and misrepresentation has been merged to such an extent with other kinds of misconduct that *neither the courts nor legal writers have found any occasion to regard it as a separate basis of liability.*" (Prosser & Keeton, *op. cit. supra,* § 105, at pp. 725-726, fns. omitted, italics added.)

Prosser and Keeton went on to state, "Liability in negligence sometimes rests upon some form of misrepresentation on the part of the defendant, by which the plaintiff, or some third person, has been misled to the plaintiff's damage. The remedy of an action for deceit[7] . . . has generally been confined to cases in which the interest affected is a pecuniary one, such as sales and credit transactions. Although negligence is sometimes involved in such cases, it has been kept within somewhat more narrow limits than where the harm is to person or property. Deceit has served as an occasional remedy where there is such harm to tangible interests, but for the most part *cases of misrepresentation resulting in physical harm have been dealt with in an action for negligence.*" (*Id.* at p. 205, fns. omitted, italics added.) In describing situations analogous to the case at bar, Prosser and Keeton wrote, "An assurance that a bridge or campus is safe, or that there is no danger from blasting operations, or from the location of a plane, may result in liability *for negligence* when the plaintiff relies upon the assurance and suffers injury." (*Id.* at pp. 205-206, fns. omitted, italics added.)

Similarly, Professors Harper, James and Gray explained that "[w]here misrepresentations entail the foreseeability of physical harm and such harm

---

[6] "It is not clear whether the court [in *Holt* v. *Kolker* (1948) 189 Md. 636 (57 A.2d 287)] is considering negligent misrepresentation as part of the law of negligence or under the heading of fraud and deceit, as in one breath it speaks of lack of duty owing the plaintiff by the defendant and in the next it discusses justifiable reliance in language sounding in an action for fraud and deceit. . . . This is not startling in light of the diversity of opinion among writers and the courts as to both the extent and theory of liability for negligent misrepresentations which result in injury to person or property." (Note (1948) 22 So.Cal.L.Rev. 77, 78.)

[7] Negligent misrepresentation "is a form of deceit without . . . the element of scienter." (*Yanase* v. *Automobile Club of So. Cal.* (1989) 212 Cal.App.3d 468, 473 [260 Cal.Rptr. 513].)

in fact results, *the ordinary rules of negligence have for some time been applied.*" (2 Harper et al., The Law of Torts (2d ed. 1986) § 7.6, p. 403, italics added.) They offer two reasons why negligent misrepresentation is a more limited tort than negligence. First, "the range of physical harm is more limited. In the field of economic harm, however, '[i]f liability for negligence exists, a thoughtless slip or blunder . . . may expose [defendants] to a liability in an indeterminate amount for an indeterminate time to an indeterminate class.' " (*Id.* at p. 404, fns. omitted, quoting *Ultramares Corp.* v. *Touche, Niven & Co.* (1931) 255 N.Y. 170 [174 N.E. 441, 74 A.L.R. 1139].) Second, "A person who relies on a misrepresentation can recover for losses . . . only if the law regards his reliance as justifiable. This limitation on liability again reflects the customs and ethics of the market place, which have traditionally allowed some latitude for dishonesty in bargaining situations. . . . In bargaining, as in diplomacy and politics, there is an area in which a certain amount of rhetoric is used and expected, and nobody has a right to take it seriously." (2 Harper et al., *op. cit. supra,* § 7.8, at pp. 423-424.)

When Prosser and Keeton noted that "neither the courts nor legal writers have found any occasion to regard [misrepresentations resulting in physical harm] as a separate basis of liability" (*op. cit. supra,* § 105, at p. 726), why do the majority choose this occasion to ignore stare decisis and to create new law? They rely in part on section 311 of the Restatement Second of Torts (section 311). Section 311 was not intended, however, to create a basis of liability separate from and narrower than the tort of negligence. All the comments to that section emphasize the breadth of liability for negligent misrepresentations resulting in physical harm, indicating that the members intended to clarify the broad rules of negligence, not create a narrower tort.

As *comment (a)* observes, "The rule stated in this Section represents a somewhat broader liability than the rules stated as to the liability for pecuniary loss resulting from negligent misrepresentation, stated in § 552 . . ." Comment (b) notes that the rule finds particular application when part of the speaker's business or profession is to give information on which the safety of the recipient or a third person depends, but is "not, however, limited to information given in a business or professional capacity . . . . It extends to *any* person who, in the course of an activity which is in furtherance of his own interests, undertakes to give information to another, and knows or should realize that the safety of the person or others may depend upon the accuracy of the information." (Italics added.)

Comment (c) observes that the rule may apply when the information given is purely gratuitous, again emphasizing the rule's amplitude. Comment (d) instructs that "negligence may consist of failure to make proper

inspection or inquiry, or of failure after proper inquiry to recognize that the information given is not accurate." Comment (e) points out that "[i]t is . . . not enough that the actor has correctly ascertained the facts on which his information is to be based and has exercised reasonable competence in judging the effect of such facts. He must also exercise reasonable care to bring to the understanding of the recipient of the information the knowledge which he has so acquired." And finally, comment (f) incorporates comments (c) and (d) to section 310, which stress that the speaker's liability extends to all those foreseeably endangered, not solely the recipient, and covers all foreseeable damages, not simply the harm resulting from the conduct the misrepresentation was intended to influence. In light of the comments, I am confident the members of the American Law Institute would be surprised to learn that section 311 is being used to justify a narrower basis for liability than the tort of negligence.

In his concurring opinion, the Chief Justice joins in the majority's view that under section 311 a plaintiff must plead and prove his "reasonable reliance" on the defendant's representation. He maintains that the numerous "venerable commentators" cited herein "misperceive the true state of the common law," and notes that "each of the . . . cases [they rely on] in which recovery was allowed either recognized the plaintiff's reasonable reliance, or such reliance was clear from the facts." (*Ante,* at pp. 743-744.) This misses the point. The issue is not whether the reasonableness of plaintiff's reliance is relevant, but whether plaintiff or defendant bears the burden of pleading and proof on the matter. Certainly nothing on the face of section 311 purports to alter the common law rule that the reasonableness of a plaintiff's conduct is examined under the doctrines of contributory or comparative negligence. The concurring opinion's reliance on *Webb* v. *Cerasoli* (1949) 275 App.Div. 45 [87 N.Y.S.2d 884], affd. mem. 300 N.Y. 603 [90 N.E.2d 64], and *Holt* v. *Kolker, supra,* 189 Md. 636, is misplaced.

In *Webb,* the jury awarded the plaintiff, a painter, damages for injuries sustained when he fell from a marquee while painting the home of the defendant. The defendant was held liable "in negligence" (275 App.Div. at p. 46) for speaking carelessly to the plaintiff's employers regarding the safety of the marquee as a place from which to work. The appellate division of the supreme court reversed the judgment. Two of the justices on the five-member panel emphasized that the defendant was "a simple householder" who expressed "an opinion" and not "a representation or assurance of a fact which the speaker presumed *to know*," and that the plaintiff had "much more extensive experience and possessed more knowledge" than the defendant in this area. The basis of the plurality opinion is unclear: at one point it suggests the defendant had no duty to speak carefully (*id.,* at p. 47)

and at another point the author states, "I fail to see how . . . plaintiff can be exonerated from contributory negligence as a matter of law." (*Id.*, at p. 50.) The concurring justice stressed the fact that the plaintiff had 14 years of experience as a painter and that the marquee was supported by only 2 chains. The basis of his concurrence is clear: "In my opinion plaintiff was guilty of contributory negligence as a matter of law." (At p. 51 (conc. opn. of Foster, P. J.).) The dissenting justices concluded, "Having invited the plaintiff to work in a place of danger, the defendants must bear the consequences." (*Ibid.* (dis. opn. of Deyo, J.).)

In *Holt*, a landlord hired two plumbers to install a toilet on a porch extending from the plaintiff's home. Before the work was begun the landlord assured the plaintiff that she could safely use the porch during the repairs, and when the plaintiff asked one of the plumbers if she could safely walk on the porch while he was installing a pipe, he replied, "Well, if it holds a man like me, it will hold a little woman like you." Shortly after the plumbers completed the job, the plaintiff sustained injuries when the porch floor collapsed beneath her. The court affirmed a judgment on directed verdict for defendant plumber. "In this case it is clear that the plumber was not under a duty to plaintiff growing out of any previous relation to plaintiff or the property, or for having any special knowledge as to the condition of the porch. At the most his statement before the work was begun was a mere concurrence in the landlord's statement. . . . [T]he alleged statements of [the plumbers] were such casual expressions of opinion as plaintiff was not entitled to rely upon under the circumstances." (189 Md. at p. 640.)

Neither of these cases, four decades old, stands for the proposition that a plaintiff must plead and prove reasonable reliance.[8] Indeed, in *Webb* three justices (the two dissenting justices and the concurring justice) concluded that the defendant had a duty to speak carefully, while the concurring justice clearly stated, and the plurality suggested, that what precluded plaintiff's recovery was his contributory negligence. I submit that *Webb*'s treatment of the contributory negligence issue is entirely consistent with the

---

[8] The Chief Justice, in his concurrence, quotes out of context from Tentative Draft No. 5 of the second Restatement to give the impression that the drafters unambiguously support his interpretation of *Holt* and *Webb*. (*Ante,* at p. 743.) Note (4), from which the quotation is taken, addresses the issue of whether liability under section 311 should extend to "information given gratuitously, and not in the course of an activity in which the actor has any interest. . . ." The drafters cite *Holt* and *Webb* to make clear that these cases did not hold to the contrary.

Thus, the drafters were not concerned in note (4) with a nuanced discussion of justifiable reliance, or in clarifying whether this element should appear in the plaintiff's or defendant's case. Rather, they sought to establish the quite unrelated principle that section 311 liability does not depend on a financial relationship between plaintiff and defendant. Note (4) is dubious authority in support of any other proposition.

historical analysis set forth herein; it certainly provides no support for the majority's view. In short, the majority fail to cite a single case in which a court has held that the plaintiff bears the burden of pleading and proving the reasonableness of his reliance on a defendant's misrepresentation. As I will show, numerous courts both before and after the second Restatement have treated a plaintiff's reasonableness, or rather an alleged lack thereof, as a matter for defendant to plead and prove under the doctrines of contributory or comparative negligence.

## IV

*Michael J., Bastian* and *Connelly* were reviewed at the pleading stage, after defendants had successfully demurred; nevertheless, none of the courts required plaintiffs to plead, as the majority do today, that they reasonably relied on the defendants' misrepresentations.[9] Without question, a plaintiff who suffers physical injuries as a result of a defendant's misrepresentation must allege sufficient facts to show that he relied on those misrepresentations. Without such facts, there is no showing of causation, an essential element of a cause of action for negligence. The majority, however, engraft a requirement that plaintiff plead and prove that he *reasonably* relied on defendant's misrepresentation, a requirement that is not supported by any of the cases cited (see *ante*, at p. 737, fn. 7) and is, as explained below, contrary to well-established precedent.

That reasonable reliance is not an element in plaintiff's cause of action is clear: as in any cause of action for negligence, the reasonableness of a plaintiff's conduct is considered, if at all, under the doctrine of contributory or comparative negligence. In *Seagraves* v. *ABCO Manufacturing Co.* (1968) 118 Ga.App. 414 [164 S.E.2d 242], the plaintiff, a welder for 18 years, was injured when he attempted to strike an arch to a tank containing inflammable liquid, in reliance on the assurance of defendant's president that the tank had been "cleaned out." The court of appeal acknowledged there was uncontradicted testimony that if the plaintiff had taken safety precautions customary in the welding industry the explosion would not have occurred. It nevertheless reversed the judgment for defendant on directed verdict. It noted that Georgia follows the doctrine of comparative negligence, not contributory negligence, and explained that "[p]laintiff's actions were to be measured by the standard of a reasonably prudent man;

---

[9] Much of the majority's discussion of reasonable reliance echoes the rejected position of the concurring and dissenting retired superior court judge sitting temporarily in *Connelly*: "it is to be noted that the direct cause of the damage alleged was the rise in the waters of the river. The information given had no causal connection with that fact. As the water level rose inch by inch, [the plaintiff] had as full knowledge of what was happening as did [the defendants]." (3 Cal.App.3d at p. 761 (dis. opn. of David, J., pro tem.).)

by that standard he was not necessarily required to follow the safest course of conduct. Where the duty is that of ordinary care, one is not negligent (or contributorily negligent) merely because of failure to exercise that degree of care which would have absolutely prevented injury." (164 S.E.2d at pp. 245-246.) The court concluded, "It is plain that it was a question for the jury whether plaintiff should have anticipated the presence of the inflammable substance in the tank and the danger of welding it in that condition. One who relies on representations of another and fails to take precautions for his own safety is not guilty of contributory negligence if a reasonable man would have relied on the representations under the same circumstances." (*Id.* at p. 246.)

In *Freeman v. United States* (6th Cir. 1975) 509 F.2d 626, parachutists died and were injured when an air traffic controller negligently informed the pilot that the aircraft was near its target when in fact it was over Lake Erie. The trial court found that the parachutists were not contributorily negligent because they had no reason to suspect that the jump master would signal them to jump into solid cloud cover and because they had no reasonable means of making an independent observation of the cloud conditions below the plane. (*Id.* at p. 632.) The court of appeals affirmed.

In *Robb* v. *Gylock Corporation* (1956) 384 Pa. 209 [120 A.2d 174], a truck driver relied on representations by defendant's employee that carboys, which actually contained sulfuric acid, were empty. The plaintiff had noticed the carboys were wet and heavier than usual, but the court rejected the defendant's contention that the plaintiff was contributorily negligent as a matter of law because he failed to make his own investigation. It noted that the plaintiff twice inquired whether the carboys were empty, and held that the plaintiff's "failure to investigate further was not contributory negligence as a matter of law, and the question was properly left to the jury." (120 A.2d at p. 175.)

In *Virginia Dare Stores* v. *Schuman* (1938) 175 Md. 287 [1 A.2d 897], a cleaning company employee relied on a store manager's representation that it was safe to stand on the molding of a dress case to reach the walls he was to wash. The court held that "the question of contributory negligence on the part of the [plaintiff] was one for the jury's determination." (1 A.2d at p. 902.)

In *Washington & Berkeley Bridge Co.* v. *Pennsylvania Steel Co.* (4th Cir. 1915) 226 Fed. 169, a workman recovered a judgment against his employer, a steel company, after he sustained injuries when a pier on which he was working collapsed. The steel company then sued a bridge company for negligence, alleging that the steel company's foreman relied on a representation by the bridge company's engineer that the pier would be safe. The court

reversed a judgment for the steel company on directed verdict, concluding that "there was such evidence of contributory negligence on the part of the plaintiff as to require that issue to be submitted to the jury." (*Id.* at p. 172.)

As in *Michael J., Bastian* and *Connelly,* the plaintiffs in these cases suffered physical harm outside the context of commercial transactions; their causes of action were for negligence, not negligent misrepresentation. As in this case, it is the allegedly negligent defendant who should bear the burden of proving that plaintiff's reliance was unreasonable.

By contrast, comparative negligence is not a defense to the tort of negligent misrepresentation under California law. In *Carroll* v. *Gava* (1979) 98 Cal.App.3d 892 [159 Cal.Rptr. 778], the Gavas sold a mobilehome park site to the Carrolls, representing that it was zoned for mobilehomes. The Carrolls later sold the site and were sued by the buyer when it was discovered the site was not zoned for mobilehomes. The Carrolls then cross-complained against the Gavas for negligent misrepresentation, and recovered damages for their pecuniary losses. The Court of Appeal rejected the Gavas' contention that comparative negligence should be applied to defeat the damage award. "[T]he concept [of comparative fault] has no place in the context of ordinary business transactions. The modern law of misrepresentation evolved from the 'action on the case of deceit' in business transactions. Business ethics justify reliance upon the accuracy of information imparted in buying and selling, and the risk of falsity is on the one who makes a representation. This straightforward approach provides an essential predictability to parties in the multitude of everyday exchanges; application of comparative fault principles, designed to mitigate the often catastrophic consequences of personal injury, would only create unnecessary confusion and complexity in such transactions." (*Id.* at p. 897, citations omitted; see also 3 Levy et al., Cal. Torts (1989) Business Torts, § 40.11, p. 46 ["the element of justifiable reliance . . . seems to take the place of a defense of contributory negligence"]; 1 Lee & Lindahl, Modern Tort Law (1988) § 10.21, p. 298 ["contributory negligence is not a defense where misrepresentation, fraud or deceit is the basis of the action"].)

In short, the majority opinion reintroduces confusion into an area of law that courts and commentators have endeavored to clarify. These authorities are virtually unanimous in support of the proposition that negligent misrepresentations resulting in physical injury give rise to a cause of action for negligence, not negligent misrepresentation. Under standard pleading rules, the complaint sufficiently alleges that Morales relied on Ybarra's statements. Fortunately, the majority's error will not have significant ramifications in this case because plaintiffs can easily amend the complaint;

it can only be hoped, however, that the bench and bar will not be misled in other areas such as the treatment of comparative negligence.[10]

V

I would reverse the judgment of the Court of Appeal dismissing plaintiffs' first cause of action.

The Court of Appeal in this case properly recognized that the general rule of negligence in California is that a person is liable "not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person." (Civ. Code, § 1714; *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 111-112 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496] (*Rowland*).) In *Rowland* we held that "[a] departure from this fundamental principle involves the balancing of a number of considerations; the major ones are the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Id.* at pp. 112-113.)

The Court of Appeal, after examining three of the seven factors identified in *Rowland,* concluded that Ybarra should not be held liable. After analyzing the *Rowland* factors, I conclude that at least six weigh in plaintiffs' favor and do not warrant a departure from the fundamental principle that every person is liable for injuries occasioned by his failure to use ordinary care. I will review these factors seriatim, beginning with foreseeability.

Defendants assert in essence that Morales had no reasonable basis to rely on Ybarra's advice because she more than anyone knew how dangerous

---

[10]The concurring opinion suggests that legitimate jurisprudential and policy reasons exist to require a plaintiff plead and prove reasonable reliance. It asserts, "the plaintiff will often be in the best position, and have the final opportunity, to avoid any risk of harm. He must ultimately decide, based on his own assessment of the circumstances known to him, whether to act on the representations of the defendant." (*Ante,* at p. 744.) Whatever jurisprudential value the rule has in general, it seems singularly unfair to require plaintiffs in this case to plead the specific circumstances known to their deceased mother. Even as a general matter, the reasoning is unsound. It is what Prosser and Keeton describe as "something resembling billiard-parlor reverse English," by which a few courts "have even purported to recognize a 'last clear chance' doctrine in favor of the defendant, to bar the plaintiff's recovery." (*Op. cit. supra,* § 66, at p. 464.) Moreover, the reasoning reminds the bench and bar of the harsh "all-or-nothing" approach of contributory negligence this court rejected in *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393].

Johnson could be. The argument is flawed in two respects. First, "foreseeability is not to be measured by what is more probable than not, but includes whatever is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct. One may be held accountable for creating even the risk of a slight possibility of injury if a reasonably prudent [person] would not do so." (*Bigbee* v. *Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 57 [192 Cal.Rptr. 857, 665 P.2d 947], citations and internal quotation marks omitted.) Even if we assume that Morales knew Johnson had killed his wife, there is *some possibility* that Ybarra's "advice" would have an effect on how she viewed her current relationship with Johnson and what steps, if any, she should take to protect herself from him. A reasonable person in Ybarra's place would take account of this risk in guiding his conduct.

Second, while we know that Morales realized Johnson had been dangerous, unless we are prepared to conclude that no reasonable person charged with such knowledge would be influenced by statements of the perpetrator's parole officer, we cannot hold that Morales's injuries were unforeseeable as a matter of law. It is well settled that unless there is no room for a reasonable difference of opinion, foreseeability of harm is a question of fact for a jury. (*Pool* v. *City of Oakland* (1986) 42 Cal.3d 1051, 1063 [232 Cal.Rptr. 528, 728 P.2d 1163]; *Isaacs* v. *Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 126 [211 Cal.Rptr. 356, 695 P.2d 653]; *Bigbee* v. *Pacific Tel. & Tel. Co., supra,* 34 Cal.3d at p. 56; *Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36]; *Vandermost* v. *Alpha Beta Co.* (1985) 164 Cal.App.3d 771, 779 [210 Cal.Rptr. 613]; *Bloomberg* v. *Interinsurance Exchange* (1984) 162 Cal.App.3d 571, 577 [207 Cal.Rptr. 853]; *Myers* v. *Quesenberry* (1983) 144 Cal.App.3d 888, 892 [193 Cal.Rptr. 733].) Ybarra cannot now rely on Morales's fear—the very fear that his reassuring words are alleged to have dispelled.

The second *Rowland* factor, the degree of certainty that the plaintiff suffered injury, was not addressed by the Court of Appeal. Its role is usually confined to cases of negligent infliction of emotional distress and, in such cases, is generally a question for the jury. In this case, plaintiffs, the now-motherless children of Morales, have certainly suffered injury.

The third *Rowland* factor, the causal connection between the defendant's conduct and the injury suffered, is a closer question. Concluding the connection in this case was too nebulous as a matter of law to support liability, the Court of Appeal reasoned, "The weakness of the connection between Ybarra's bad advice and Morales's death is illustrated by the difficulty in showing concretely how Ybarra's act resulted in the murder. Plaintiffs do not say that Morales followed Ybarra's advice in any way, as by reconciling

with Johnson, resuming the relationship, opening the door to him when she would not otherwise have done so, or in any way making herself more accessible to him because Ybarra told her she had nothing to fear. . . . [The complaint] fails to assert any course of action upon which she might have embarked to protect herself, nor any precaution she did not take, because of Ybarra's outrageous advice. . . . The frightening reality is that for one in Morales's position there frequently is nothing she can do to protect herself."

I am unwilling to subscribe to the fatalistic view that as a matter of law women in Morales's position can do nothing to protect themselves. To the contrary, among numerous possibilities she could have stayed at a women's shelter or with relatives, improved her home security, alerted her neighbors and the police, moved to a distant location, or applied for a temporary restraining order. Moreover, the Court of Appeal holds plaintiffs to too high a standard of pleading in requiring them to "show[ ] concretely how Ybarra's act resulted in the murder." Rather, " 'it is the settled rule in California that negligence *and proximate cause* may be simply set forth.' " (4 Witkin, Cal. Procedure, (3d ed. 1985) Pleading, § 562, at p. 600, quoting *Roberts* v. *Griffith Co.* (1929) 100 Cal.App. 456, 461 [280 P. 199], italics added in Witkin.) It is not surprising therefore that defendants cite no case that requires a plaintiff to plead what specific steps the victim would have taken had the defendant not acted negligently. Under the established rules of negligence that require liberal construction of pleadings, the allegation that Morales failed to take steps to protect herself as a proximate result of Ybarra's statements is sufficient to withstand defendants' demurrer.

The fourth *Rowland* factor, the moral blame attached to the defendant's conduct, weighs heavily in plaintiffs' favor. It is difficult to conceive an acceptable excuse for Ybarra's statements to Morales. One can surmise he believed that if he could convince her to return to Johnson, she would be a stabilizing influence on him and help him lead a productive and law-abiding life. Perhaps he was motivated by an ill will toward her and his entreaties were made with a reckless disregard for their truth or falsity. From the removed perspective of an appellate court, with only the cold record of the pretrial proceedings before us, I would not presume to determine the factors that motivated Ybarra. It can assuredly be said, however, that Ybarra's conduct itself was, in the words of the Court of Appeal, "clearly outrageous."

The fifth *Rowland* factor is the policy of preventing future harm. We have repeatedly refused to impose a duty to warn potential victims based on a law enforcement officer's mere knowledge that there is some danger. (*Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197, 208-209 [185 Cal.Rptr.

252, 649 P.2d 894]; *Thompson* v. *County of Alameda* (1980) 27 Cal.3d 741, 758 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701]; *Hayes* v. *State of California* (1974) 11 Cal.3d 469, 473 [113 Cal.Rptr. 599, 521 P.2d 855].) "Imposition of a duty to warn [a victim], premised on the theory that she was a potential victim of a potential assailant, necessarily implies a general duty to warn other potential victims in the vicinity. . . . [O]ur past decisions teach that it is inappropriate to impose such a duty—which may paralyze a neighborhood—under pain of tort liability." (*Davidson* v. *City of Westminster, supra,* 32 Cal.3d at pp. 208-209, citations omitted.) But to impose liability for Ybarra's statements, on the theory that a parole officer's misrepresentation of the risk of danger posed by a parolee to a specifically identified victim could cause foreseeable harm, would not hamper the efforts of parole officers to effectively perform their duties. Indeed, the important policy of preventing future harm is significantly furthered by assessing liability for injuries caused by affirmative misrepresentations.

The Court of Appeal's analysis of the sixth *Rowland* factor, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care, is puzzling. On the basis of its unwarranted assumption that "Nothing short of confining Johnson could probably have prevented this death," the Court of Appeal concluded that "the decision to leave [Johnson] at large is not actionable by virtue of the immunity statutes." Again, the Court of Appeal misconceives the premise of liability. By failing to appreciate that plaintiffs' action is based on the affirmative misconduct of Ybarra which allegedly increased the danger faced by Morales, and not on Ybarra's failure to confine Johnson, the Court of Appeal in effect creates immunity where the Legislature created none.

Having concluded that six of the seven *Rowland* factors examined above militate in plaintiffs' favor, I am of the view that the final *Rowland* factor, the availability, cost and prevalence of insurance for the risk involved, even if it weighed heavily in defendants' favor, could not support a departure from the fundamental principle that all persons are responsible for injuries caused by their failure to exercise due care.

## VI

I reluctantly concur in the majority's affirmance of the judgment in favor of defendants on plaintiffs' cause of action under 42 United States Code section 1983. In *DeShaney* v. *Winnebago County Dept. of Social Services* (1989) 489 U.S. 189 [103 L.Ed.2d 249, 109 S.Ct. 998], after the defendant department of social services received reports that an infant, Joshua, was being abused, it obtained a court order placing him in the temporary custody of a hospital. Three days later, it returned Joshua to the custody of his

father, who beat him so severely that he fell into a life-threatening coma. The court affirmed summary judgment in favor of the defendants, holding that "In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom *to act on his own behalf*—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." (*Id.* at p. 200 [103 L.Ed.2d at p. 262, 109 S.Ct. at p. 1006], italics added.)

If the affirmative act of placing a three-year-old boy in the custody of his abusive father does not "restrain" the boy's freedom "to act on his own behalf," the allegations of Ybarra's misconduct a fortiori do not meet this stringent standard. Even if Ybarra's entreaties caused Morales, a competent adult, to forgo precautions she would otherwise have taken, we cannot say that Ybarra thereby "restrained" her freedom to act on her own behalf. Under the high standard set by the Supreme Court in *DeShaney,* I agree that the complaint fails to state a cause of action under 42 United States Code section 1983.

In other respects I would reverse the Court of Appeal's decision.

Broussard, J., and White (Clinton W.), J.,* concurred.

---

* Presiding Justice, Court of Appeal, First Appellate District, Division Three, assigned by the Chairperson of the Judicial Council.