[No. D006953. Fourth Dist., Div. One. May 23, 1989.]

CITY OF SANTEE et al., Cross-complainants and Respondents, v. COUNTY OF SAN DIEGO, Cross-defendant and Appellant.

**COUNSEL**

Lloyd M. Harmon, Jr., County Counsel, Daniel J. Wallace, Chief Deputy County Counsel, and Richard A. Milligan, Deputy County Counsel, for Cross-defendant and Appellant.

Stutz, Rentto, Gallagher & Artiano, Sidney A. Stutz, Mitchell S. Wagner, McInnis, Fitzgerald, Rees, Sharkey & McIntyre, George E. Fleming, Gilson & Heaton and Virginia R. Gilson for Cross-complainants and Respondents.

**OPINION**

**FROEHLICH, J.**—Cross-defendant County of San Diego (County) appeals from a judgment in favor of cross-complainants City of Santee (Santee) and Southwest Signal Company (Southwest), and from the order denying County's motion for judgment notwithstanding the verdict. The judgment required County to indemnify cross-complainants, jointly, in an amount representing 9 percent of the settlement sum paid to plaintiff Fleming by cross-complainants.

The sole issue necessary to disposition of this case is whether County owed a duty in tort to cross-complainants. In light of our decision that no

duty was owed as a matter of law, all of the other issues urged by County are rendered moot.

### 1. *Facts*

The main action was commenced by plaintiff Fleming, a bicyclist who suffered serious injuries when struck by an automobile driven by defendant Kreger. The accident occurred during the early morning darkness on December 11, 1984, at an intersection in the City of Santee.

Fleming's complaint, filed against Santee and Southwest, alleged the accident occurred primarily because the intersection was improperly lighted, due to a nonfunctioning streetlight above the intersection. The light had been inoperative for many months; a testing engineer, hired by Santee to inspect its streetlights, had listed the light as inoperative in his August 1984 report to Santee.

Santee cross-complained against Southwest, seeking express and implied indemnity and equitable apportionment. Santee sought indemnity from Southwest based on a contract between Santee and Southwest, under which Southwest was responsible for maintaining and repairing street and signal lights throughout Santee.

Santee (and, subsequently, Southwest) also sought indemnity from County. Originally, Santee[1] sought indemnity based upon a contract (the Law Enforcement Contract), entered into between Santee and County, under which the County sheriff's department was to provide certain law enforcement services to Santee. Santee contended the sheriff was contractually obligated to report any possibly unsafe or hazardous road conditions on city roads, including streetlight lamp malfunctions. The jury, by special verdict, rejected cross-complainants' contract arguments, finding the Law Enforcement Contract did not impose any duty on the sheriff to report inoperative safety lights.

Santee's alternative theory against the County was that the sheriff's department had, by the prior conduct of some of its deputies, undertaken a noncontractual duty to report outages. Santee, apparently cognizant of the general rule that a person who has not created a peril (here, the light outage) has no affirmative duty to take any action (such as reporting the

---

[1] Santee and Southwest asserted substantially identical theories against County. Insofar as is relevant to this appeal, both Santee and Southwest argued, and the jury found, the sheriff owed both Santee and Southwest a duty to report streetlight outages pursuant to a "special relationship." Because the theories are identical, all further references to Santee shall refer to Santee and Southwest collectively, unless otherwise noted.

outage) to aid the endangered person, claimed the sheriff's department had an obligation to take some affirmative action because an alleged "special relationship" existed between the sheriff's department and Santee.

The "special relationship" allegedly arose because Santee relied on the sheriff's department to inspect for, and report, streetlight outages. Santee was a newly formed city, with insufficient staff to undertake the task of lighting inspection. Although the sheriff's department never specifically promised Santee that its deputies would inspect and report light outages, Santee personnel nevertheless believed it was "an expected function" for the sheriff to provide such a service. Santee personnel's subjective understanding was based in part on their subjective interpretation of the Law Enforcement Contract, and in part because they had received sporadic reports on traffic hazards in the past.

Santee argued that, because one or two individual deputies had gratuitously reported light outages in the past, Santee was entitled to (and did detrimentally) rely on all deputies to report future light outages, which gave rise to a special relationship imposing a duty on the sheriff's department to inspect for and report light outages. The evidence indicated one or more deputies may have voluntarily reported streetlight outages prior to the accident. However, there was no evidence any deputy had been instructed to report street light outages. Instead, the deputies testified they felt they should report any form of road hazard, which they noticed during the course of discharging their law enforcement functions of crime control and traffic enforcement, not because it was their duty but simply because (in the words of two deputy witnesses) it was "common sense."

In essence, Santee contends that sporadic, voluntary acts by individual "Good Samaritan" deputies created a duty for both the individual volunteers, and for all of their coemployees in the sheriff's department, to continue rendering assistance into the indefinite future.

2. *Neither the Sheriff's Department nor the Individual Deputies Had Any Continuing Duty to Either Santee or Southwest to Report Light Outages Because There Was No Special Relationship Imposing Any Such Duty*

█ It is a well established general rule that a person who has not created a peril has no duty to come to the aid of a third party to protect the third party against injury from that peril. (*Williams* v. *State of California* (1983) 34 Cal.3d 18, 23 [192 Cal.Rptr. 233, 664 P.2d 137].) █ As applied here, neither the sheriff's department nor its officers had any general duty to come to the aid of Santee or Southwest by reporting light outages.

In the absence of a special relationship imposing an affirmative duty to provide assistance, the sheriff's failure to report this particular light outage constitutes simple nonfeasance, which the courts consistently hold is not actionable. (*Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197 [185 Cal.Rptr. 252, 649 P.2d 894] [nonfeasance: failure to warn victim of known potential danger]; *Hartzler* v. *City of San Jose* (1975) 46 Cal.App.3d 6 [120 Cal.Rptr. 5] [nonfeasance: failure to respond promptly to plea for help]; *Bonds* v. *State of California* ex rel. *Cal. Highway Patrol* (1982) 138 Cal.App.3d 314 [187 Cal.Rptr. 792] [nonfeasance: failure to remove disabled vehicle from freeway].)

Santee claims a special relationship existed between it and the sheriff's department, which imposed an affirmative duty on the sheriff to act in protection of Santee's interests. ■ Santee thus seeks to come within the exception to the general rule of "no duty to act," commonly referred to as the "Good Samaritan rule": ". . . [T]he volunteer who, having no initial duty to do so, undertakes to come to the aid of another—the 'good Samaritan' . . . is under a duty to exercise due care in performance and is liable if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking. [Citation.]" (*Williams* v. *State of California, supra,* 34 Cal.3d at p. 23.)

■ ■ ■ ■ ■ We conclude, as a matter of law,[2] the sheriff's department did not have a "special relationship" with Santee creating an affirmative duty to report light outages. We reach this conclusion on three grounds. First, a Good Samaritan who has performed a series of voluntary acts in the past is not thereafter required indefinitely to continue performing such acts into the future. Second, any duty imposed on the Good Samaritan is limited to the individuals who originally performed the voluntary act. The act of one sheriff cannot, as Santee asserts, draft the entire sheriff's department into an army of Good Samaritans based on the voluntary acts of individual deputies. Third, there are significant policy reasons for declining to impose such a continuing duty upon any "Good Samaritan," much less upon law enforcement officers.

---

[2] The existence of a legal duty is entirely a question of law. (*Stout* v. *City of Porterville* (1983) 148 Cal.App.3d 937, 941 [196 Cal.Rptr. 301] [finding no "special relationship" duty as a matter of law]; 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 748.) The existence of a legal duty ". . . is entirely a question of law, to be determined by reference to the body of statutes, rules, principles and precedents which make up the law; and it must be determined only by the court." (Prosser & Keeton, Torts (5th ed. 1984) Negligence: Proof, § 37, p. 236.)

### A. *Past Voluntary Acts Do Not Impose Any Continuing Obligation to Render Future Aid, Even if the Benefited Party Claims He Detrimentally Relied Upon the Volunteer to Perform Future Acts.*

Santee argues that, inasmuch as deputies had previously reported light outages, the sheriff was obligated to continue performing these acts of assistance, because Santee detrimentally relied and depended on the sheriff for this assistance, thereby creating a special relationship. We disagree.

No California authority has imposed a continuing obligation on a Good Samaritan to render future acts of assistance merely because past acts of assistance had been rendered.[3] Instead, the only cases imposing a "special relationship" duty on an officer affirmatively to aid an imperiled citizen (and the attendant liability for nonfeasance) have all involved single, discrete transactions. In *Williams,* an officer came to the aid of an injured motorist, but failed to undertake an investigation of that accident to secure evidence or witnesses, or to pursue the driver responsible for the accident. The court specifically held that, while a police officer does not owe a general duty to assist every victim, he may occasionally undertake a protective relationship to a specific victim from which a "special relationship" duty to act may arise. Implicit in the court's distinction between the obligations owed to the public at large (no duty) and a specifically aided member (possible duty) is the concept that the obligation is limited to the *person and occasion* to which the aid is rendered.

Again, in *Mann* v. *State of California* (1977) 70 Cal.App.3d 773 [139 Cal.Rptr. 82], the officer placed his car behind plaintiff's disabled vehicle in a protective position, but then departed his protective position without warning and without waiting for the tow truck to assume the protective position previously occupied by the officer's patrol car. The court held the officer could not undertake to protect the plaintiff, thereby inducing the plaintiff to refrain from protecting himself, and then withdraw the protection without warning plaintiff, who was relying upon the officer to protect him *during that episode.*

Significantly, each case imposed a possible duty because an individual officer had commenced a protective undertaking. The officer's conduct

---

[3] The only authority which imposed a duty to provide assistance in the future was *Morgan* v. *County of Yuba* (1964) 230 Cal.App.2d 938 [41 Cal.Rptr. 508]. There, a prisoner had made threats on the decedent's life. The sheriff failed to warn the decedent that the prisoner had been released from custody, and the court held the sheriff had breached an obligation owed to the decedent when he failed to inform her that the prisoner was released. However, the court was careful to note that the duty to perform future voluntary acts was imposed because the sheriff had made an *express promise* to warn the decedent. Here, there is no allegation nor evidence that, prior to the accident, any express promise was made to Santee officials to report light outages.

during the transaction either increased the risk to which the citizen was exposed during that episode, or induced the citizen to forego taking protective measures during the episode because the officer was apparently providing such limited protection. The courts, by imposing liability, have in essence declared that an officer who starts a protective undertaking must finish that undertaking. If he fails to complete the task, and his failure to complete the task increases the citizen's peril because the citizen justifiably relied on the officer to complete the job, nonfeasance may give rise to liability.

It is far different, however, to require an officer to *commence* a protective undertaking merely because he (or other officers) had previously provided similar aid to the imperiled citizen. Instead, California courts have declined to impose such a duty on law enforcement officers. In *Baker v. City of Los Angeles* (1986) 188 Cal.App.3d 902 [233 Cal.Rptr. 760], an analogous situation was examined. In *Baker,* the police had previously responded to two prior domestic disturbance calls at the plaintiff's home, and in each case had taken some steps to protect the plaintiff from potential violence from her husband. In the first visit, they confiscated a gun which the husband was brandishing, and in the second visit arrested the husband for assaulting an officer. During a third call, plaintiff asked the officers to confiscate the gun, which the husband had retrieved from the police after being released from custody. The officers declined and suggested the plaintiff leave the apartment. Plaintiff declined, and the husband later shot plaintiff. Plaintiff claimed (and the trial court instructed the jury), under *Williams,* that while the initial confiscation of the gun was voluntary, confiscation of the gun created a special relationship and the return of the gun by different officers was negligent because it increased the risk of harm. Consequently, harm was suffered because plaintiff relied on the police not to unreasonably return the weapon to plaintiff.

In reversing the trial court's determination, the *Baker* court succinctly stated the limited nature of the duty undertaken by a Good Samaritan law enforcement officer: "*The duty of a 'good Samaritan' is limited. Once he has performed his voluntary act he is not required to continue to render aid indefinitely.* When he took the gun, Officer Winter voluntarily entered into a special relationship with respondent for the limited purpose of protecting her from the potential harm that threatened her *at the moment. He did not become a guarantor of her future safety. Absent an express or implied promise to render additional aid, his duty ended when he took the gun from the premises and left it at the police station for* [*respondent's husband*] *to pick up when he was no longer intoxicated. . . .*

"`. . . . . . . . . . . . . . . . . . . .

"Here respondent did not allege that Officer Winter made any representation to her as to when and under what circumstances the gun would be returned to [husband]. Furthermore her testimony that she knew [husband] had the gun when they reconciled shows that she did not rely on any implied promise that the gun would not be returned." (*Baker* v. *City of Los Angeles, supra,* 188 Cal.App.3d at pp. 907-909, italics added.)

■ The Restatement of Torts is in accord: "The fact that the actor gratuitously starts in to aid another does not necessarily require him to continue his services. He is not required to continue indefinitely . . . . The actor may normally abandon his efforts at any time unless, by giving the aid, he has put the other in a worse position than he was in before the actor attempted to aid him. . . ." (Rest.2d Torts, § 323, com. c, at p. 137.)

Santee argues *Williams* supports the imposition of a special relationship: There was a "voluntary undertaking" (i.e., deputies reported light outages in the past); failure to use due care "increased the risk of harm" (i.e., failure to report the outage exposed Santee to an increased risk of liability to motorists); and/or the harm was suffered because of Santee's "detrimental reliance on the undertaking" (i.e., because of the sheriff's undertaking, Santee made no provisions for inspection of the lights, resulting in failure to discover the light outage at the accident site).

■ Santee's reliance on *Williams* is misplaced. For example, the failure to report the light outage did not *increase* the risk posed by an inoperative light; instead, the risk posed by the inoperative light remained unaltered. The failure to report the outage only failed to *decrease* the risk. In *Von Batsch* v. *American Dist. Telegraph Co.* (1985) 175 Cal.App.3d 1111 [222 Cal.Rptr. 239], the court rejected an argument analogous to the argument proposed by Santee. There, the police responded to a burglar alarm, conducted an investigation of the premises, and reported finding no intruders; however, they failed to inspect the roof where the intruders had hidden. An employee arriving at work the following morning was killed by the intruders. Plaintiff, argued the police, by undertaking an investigation, undertook a duty to protect plaintiff from harm because plaintiff relied on an implied promise from the police that their investigation had secured the premises from the intruders. Plaintiff also contended the reliance on the police for protection increased the risk to which plaintiff was exposed. The *Von Batsch* court rejected both arguments. Rejecting the "increased risk of harm" argument, the court stated: "The complaint . . . shows no detrimental reliance by decedent . . . which worsened decedent's position. . . . The officers did not create the peril to decedent. They took no affirmative action which contributed to, increased, or changed *the risk which would have otherwise*

*existed. At most they merely failed to eliminate the* [*preexisting*] *danger of unknown intruders.*" (*Id.* at p. 1124, italics added.)

Thus, nonfeasance which results in failure to eliminate a preexisting risk is not equivalent to nonfeasance which increases a risk of harm.

 Santee primarily relies on the "detrimental reliance" prong of *Williams*. Although *Williams* recognized detrimental reliance could be premised on conduct (rather than affirmative promises) of an officer in a situation of dependency (*Williams* v. *State of California, supra,* 34 Cal.3d at p. 25), nothing in *Williams* suggests the victim's right to rely on the officer for protection could extend beyond the particular episode in which the officer provided the protective undertaking. To the contrary, the conduct which *Williams* recognized might induce detrimental reliance for assistance has always been assessed in (and we believe is appropriately limited to) the context of the discrete episode in which the aid is rendered. Indeed, detrimental reliance on the police to protect the victim from harm is not enough: The reliance must have exposed the victim to a risk of harm which was greater than the harm to which the victim was already exposed. (*Id.* at p. 28; *Lopez* v. *City of San Diego* (1987) 190 Cal.App.3d 678, 681 [235 Cal.Rptr. 583].) In *Sullivan* v. *City of Sacramento* (1987) 190 Cal.App.3d 1070 [235 Cal.Rptr. 844] the court stated: " '[W]hen the state, through its agents, voluntarily assumes a protective duty toward a certain member of the public and undertakes action on behalf of that member, thereby inducing reliance, it is held to the same standard of care as a private person or organization.' [Citation.] As stated by Prosser, the inquiry in such cases is whether the 'defendant has gone so far in what he has actually done, and has got himself into such a relation with the plaintiff, that *he has begun to affect the interests of the plaintiff adversely, as distinguished from merely failing to confer a benefit upon him.*' [Citation.]" (*Id.* at p. 1078, italics added.)

 A voluntary, discretionary protective undertaking by an officer on one occasion may, if unreasonably abandoned, leave the victim in a worse position through the victim's detrimental reliance on the conduct of the officer if such conduct induces the victim to refrain from protecting himself on that occasion. In that context, the officer's actions have begun (in Prosser's words) to "adversely affect" the plaintiff's interests. However, if the same victim is exposed to a similar plight in the future, and no officer ever arrives on the scene to offer assistance, there is nothing which dissuades the victim from protecting himself on that subsequent occasion. While the victim (like all members of the general public) might hope for police aid in a time of peril, the mere fact that police (in the exercise of their discretion) had rendered similar aid in the past does not entitle the victim to expect, or

detrimentally rely on an officer for, aid on later occasions. In that latter context, the officer has done nothing more than (in Prosser's words) failed to "confer a benefit."

Accordingly, we conclude the *Williams* criteria for establishing a special relationship is limited to the discrete episode in which the aid is rendered. Past voluntary acts of assistance do not entitle the benefited party to "detrimentally rely upon" the Good Samaritan officer to confer future benefits, at least in the absence of an express promise by the officer that future assistance will be forthcoming. While a Good Samaritan must use due care within the voluntary undertaking, he is not thereafter an indentured bodyguard to the victim who claims detrimentally to have relied on the volunteer for future assistance.

■ **B.** *Even if One Officer's Voluntary Acts Created a Special Relationship Which Required Affirmative Acts to Aid the Victim, the Only Person Obligated by the Special Relationship Is the Individual Volunteer, Not Every Member of the Agency Which Employed the Volunteer.*

Santee claims that the discretionary, voluntary act of one or two officers in reporting outages entitled Santee to expect the same assistance from all sheriff's deputies, not just the particular deputies who had provided prior assistance. There is no authority which holds the voluntary act of one deputy, relied upon by the victim, allows the victim to conscript all other deputies into an army of Good Samaritans. To the contrary, the court in *Baker* v. *City of Los Angeles* (1986) 188 Cal.App.3d 902 [233 Cal.Rptr. 760] specifically refused to create such an expanded net of obligated persons: "Additionally, the relationship established by the voluntary act of a 'Good Samaritan' is also limited. It cannot be expanded to draft all 'Samaritans' into an army obligated to the person aided. The word 'voluntary' means 'arising from one's own free will' . . . . Thus, only the one who willingly takes on the duties of a 'Good Samaritan' can be held to have assumed a duty to care [for] those he is helping.

"Here both respondent and the trial court took the position that Officer Winter's act brought the entire Los Angeles Police Department into a special relationship with respondent. It is understandable how such an assumption arose. The cases speak of the duty of the state, . . . the police, . . . or the highway patrol. . . . However, if one examines those cases, it is clear the court is imposing the duty of care only on the person or persons who voluntarily assumed a duty. . . .

"[T]he cases do not always make clear the distinction between duty and liability. Clearly under the rule of respondeat superior an employing agency

will be liable for any breach of duty by its volunteering employee, but it is the employee not the agency who has entered into a special relationship." (188 Cal.App.3d at p. 908.)

Thus, while the agency may be liable based on respondeat superior, it is the individual volunteer upon whom a duty may be imposed, not all employees of the agency. This distinction is sound. The volunteer can reasonably be expected to use due care once he has elected to provide aid to the victim. However, to expand the network of obligated Good Samaritans (who may be unaware of either the nature of the aid rendered or the identity of the beneficiary who received the aid) would result in imposing potential liability on entirely blameless individuals and/or agencies for nonfeasance merely because they are employed by the same agency which employs the Good Samaritan.

 C. *Particularly Where Law Enforcement Officers Are Involved, Public Policy Precludes Extending Good Samaritan Duties to Future Aid.*

A Good Samaritan must, of course, use due care while engaged in the discrete undertaking for which he volunteered, and nonfeasance in that situation can result in liability. However, if a victim receiving aid on one occasion can thereafter demand future aid merely by claiming he reasonably and detrimentally relied on the volunteer to provide future assistance, an act of humanitarian assistance can become an albatross of mandatory obligation in the future. If future obligations to assist can be imposed based on past acts, the natural consequence will be to discourage volunteers from coming to the aid of imperiled fellow citizens.

 Moreover, such a rule would be particularly inappropriate if applied to law enforcement officers. It is well established that officers have the discretion, but not the obligation, to render assistance, and the cases have refused to impose liability on police for failure to provide discretionary aid. "[T]he rules concerning the duty—or lack thereof—to come to the aid of another are applicable to law enforcement personnel . . . . Thus, the state highway patrol has the right, but not the duty, to investigate accidents [citations] or to come to the aid of stranded motorists [citations]." (*Williams* v. *State of California, supra,* 34 Cal.3d at p. 24.) Officers have the right, but not the duty, to warn potential victims of potential dangers (*Davidson* v. *City of Westminster, supra,* 32 Cal.3d 197 at pp. 208-209), to arrest intoxicated persons (*Stout* v. *City of Porterville* (1983) 148 Cal.App.3d 937 [196 Cal.Rptr. 301]), to investigate and remove vehicles from hazardous locations (*Posey* v. *State of California* (1986) 180 Cal.App.3d 836 [225 Cal.Rptr. 830]), and numerous other activities.

■ If Santee's argument prevailed, however, past discretionary conduct could be converted to mandatory obligations as long as the victim claimed he detrimentally relied on prior conduct and assumed similar aid would be forthcoming. The aided victim would claim (as Santee did here) that some unidentified officer had provided similar aid in the past, and the victim therefore reasonably expected identical aid from all other officers in the future. Police departments would then be placed in the undesirable position of ordering their officers never to provide aid, since one officer's act of kindness could forever become an obligatory function of all officers, enforceable through tort liability. The discretion wisely granted to law enforcement, to take such actions as are prudent to protect and aid the public at large, should not be constricted by expanding the net of tort liability under the aegis of "special relationship based on conduct detrimentally relied upon."

### 2. *Conclusion*

■ We conclude County had no duty to Santee to continue conferring benefits upon Santee, in the form of reporting light outages, pursuant to a special relationship. The officers did not create the peril; they did not commence any undertaking to report this specific light outage which in any way increased the danger or induced Santee to expect this particular light outage would be reported; and there was no express promise, by either individual officers or the sheriff's department, to provide this assistance into the future.

Because the County owed no duty to Santee to provide affirmative aid, the judgment imposing liability for breach thereof must be reversed.

### DISPOSITION

The judgment is reversed. The trial court is directed to enter a judgment that Santee and Southwest take nothing by reason of their cross-complaints against County.

Todd, Acting P. J., and Huffman, J., concurred.