[No. A045171. First Dist., Div. Three. Oct. 24, 1990.]

ROSEMARY WEISSICH et al., Plaintiffs and Appellants, v. COUNTY OF MARIN et al., Defendants and Respondents.

COUNSEL

Goldstein & Phillips, Alvin H. Goldstein, Jr., Mark L. Musto and Lisa P. Foster for Plaintiffs and Appellants.

Douglas J. Maloney, County Counsel, Mari-Ann G. Rivers, Deputy County Counsel, Senneff, Bernheim, Emery & Kelly, Senneff, Bernheim, Kelly & Kimelman, Michael D. Senneff, Mark D. Peters, John K. Van de Kamp, Attorney General, Richard D. Martland, Chief Assistant Attorney General, Marvin Goldsmith, Assistant Attorney General, Tyler B. Pon and Wayman M. Robertson, Jr., Deputy Attorneys General, for Defendants and Respondents.

OPINION

STRANKMAN, J.—In 1955, William O. Weissich, then District Attorney for the County of Marin (Marin), successfully prosecuted Malcolm Roland Schlette for arson. Over 30 years later, in November 1986, Schlette shot and

killed Weissich. Weissich's heirs at law filed a wrongful death action against defendants Marin, the County of Sonoma (Sonoma), and the State of California (the State), among others, alleging breach of a duty to warn Weissich of Schlette's continuing criminal conduct after his 1975 release from prison. Plaintiffs' action against these defendants was dismissed after the trial court sustained their demurrers without leave to amend.[1] We affirm the judgment.

### Plaintiffs' Second Amended Complaint

Plaintiffs' second amended complaint alleged the following facts, which are deemed admitted for purposes of this appeal. (See *Thompson* v. *County of Alameda* (1980) 27 Cal.3d 741, 746 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701].) Weissich was the Marin District Attorney from 1953 to 1960. He prosecuted Schlette for arson in 1955. Schlette was convicted and sentenced to 20 years in prison. At sentencing, Schlette threatened the lives of Weissich, law enforcement personnel, the trial judge, and jurors.

Shortly before his scheduled release on parole, Schlette again threatened the lives of Weissich and other law enforcement personnel involved in his prosecution, and prepared a " 'death list' " identifying Weissich as one of his intended victims. Schlette was released on parole in October 1966, but violated its terms by absconding on the same day. Weissich was warned and security was provided by law enforcement officers from the State and Marin. Eventually Schlette was apprehended and returned to prison; when he was arrested, he had $5,000 in cash, a list of weapons, and a list of the names, addresses and telephone numbers of public officials and witnesses involved in his arson prosecution.

At this time Weissich was in private practice. For some time thereafter, he took special precautions for his personal safety, including procedures for screening clients and the installation of a security door in his downtown San Rafael law office.

Schlette was released from prison in October 1975, after serving the full 20-year term of his sentence. He went to Sonoma to live with his elderly mother.

Shortly before Schlette's release, representatives of the State's Department of Justice and the California Department of Corrections met with law enforcement officials from Marin and Sonoma to discuss Schlette's plan to carry out a " 'vendetta' " against Weissich and others involved in his arson

---

[1] The complaint also named Ronald W. Byledbal, M.D., as a defendant, but this appeal does not involve plaintiffs' claims against him.

prosecution. Weissich attended the meeting and was warned of the impending release.

At that meeting, defendants "undertook, impliedly promised and agreed to coordinate and share information acquired from their law enforcement intelligence activities relative to Schlette for the purpose of warning the threatened individuals, including decedent Weissich, and interdiction of the continuing threat of violence by Schlette." Weissich "was assured by . . . defendants . . . that he would be alerted to any threatening behavior on the part of Schlette to the extent such information was known."

In 1976, Weissich moved his law offices to a new location and discontinued the precautions he had taken in his previous office.

Between 1975 and 1983, defendants were informed that Schlette was involved in continuing criminal behavior, including possession of firearms. For example, defendants were informed in October 1976 that Schlette had a stockpile of firearms. Defendants briefed each other as to Schlette's conduct, but did not warn Weissich.

In 1982, Schlette went to a gun shop owned by a Sonoma deputy sheriff and asked about making alterations to a rifle and an automatic pistol. The deputy recognized Schlette and informed his superiors and the State Department of Corrections. In January 1983, Schlette was arrested by agents of the United States Bureau of Alcohol, Tobacco and Firearms (ATF); several weapons were seized during the arrest. Members of the Sonoma Sheriff's Department participated in the arrest and search, and were aware of the weapons seized. ATF informed the Marin Sheriff's Department of the arrest.

Schlette pled guilty in federal district court to being a felon in possession of firearms. In May 1983, he was sentenced to a two-year suspended sentence and five years of supervised probation, so that he could care for his elderly mother. Defendants knew or were on actual or constructive notice of the terms of his sentencing disposition. Weissich was not given any information about Schlette's 1983 arrest and conviction.

Between 1983 and 1985, Schlette cared for his mother, who died in 1985. He then moved to Santa Rosa. Plaintiffs alleged that defendants knew or should have known that in the absence of familial ties, Schlette was likely to activate his plan of revenge against Weissich and others. However, there was no allegation that defendants knew of either Schlette's mother's death, or his move.

While still on federal probation, Schlette obtained firearms. In May 1986, Sonoma acquired information that Schlette again had possession of firearms, but took no action to detain him or warn Weissich.

Schlette went to Weissich's San Rafael law office on November 18, 1986, and shot and killed him. Schlette then committed suicide.

Based on those factual allegations, plaintiffs alleged negligent breach of a duty to warn. They alleged that defendants voluntarily assumed a duty to warn Weissich of Schlette's continuing criminal behavior, and that Weissich reasonably relied on that promise to his detriment. More specifically, the complaint alleged that as a proximate result of Weissich's dependence on defendants' assurances, he failed to take additional measures to protect himself because he was misled into believing that Schlette was no longer a significant threat. In a second cause of action, the complaint alleged a civil rights claim under 42 United States Code section 1983 (hereafter section 1983), based on the same alleged duty.

Defendants demurred on the grounds that the complaint did not allege facts giving rise to the existence of a duty and that any failure to warn was not the proximate cause of decedent's death. The trial court sustained the demurrers without leave to amend and dismissed the action as against defendants. Plaintiffs appealed.

### Proposed Third Amended Complaint

While the appeal was pending, the Supreme Court decided *Garcia* v. *Superior Court* (1990) 50 Cal.3d 728 [268 Cal.Rptr. 779, 789 P.2d 960]. *Garcia* involved an action for wrongful death and violation of section 1983, filed after a parolee killed a woman with whom he had once lived. Her children sued the state and the parole officer, alleging that although the officer knew that the parolee had threatened to kill the woman, he told her not to worry because the parolee would not come looking for her. The trial court sustained demurrers without leave to amend. The Supreme Court agreed that plaintiffs had not stated a cause of action under section 1983, but reversed insofar as leave to amend was denied. (*Garcia, supra*, at p. 741.) But instead of considering plaintiffs' duty-to-warn theory, the court held that plaintiffs should be permitted to amend to allege negligent misrepresentation involving a risk of physical harm. (*Id.*, at pp. 734-738.)

At this court's invitation, the parties have submitted supplemental briefs on the applicability of *Garcia* to this appeal. Plaintiffs have also submitted a proposed third amended complaint, purporting to state causes of action both for negligent misrepresentation as defined in *Garcia* and for breach of

the duty to warn. We will discuss the allegations of that complaint later in this opinion.

*Duty to Warn*

■ Plaintiffs contend that the facts alleged were sufficient to state a cause of action for breach of duty to warn, and that the trial court erred when it ruled on the question of duty as a matter of law. However, it is settled that the existence of duty is a question of law for the court, not the jury. (*Ballard* v. *Uribe* (1986) 41 Cal.3d 564, 572, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624]; *Thompson* v. *County of Alameda, supra,* 27 Cal.3d at p. 750.) " '[L]egal duties are not discoverable facts of nature, but merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done.' [Citation.]" (*Thompson, supra,* at p. 750.)

Plaintiffs' assertion that duty is a question of fact may reflect confusion about the variety of roles played by the concept of foreseeability in tort law. ■ As was explained recently by the Supreme Court in *Ballard* v. *Uribe, supra,* 41 Cal.3d 564, in some contexts foreseeability is a fact question for the jury, but in other contexts it is part of the calculus used by a court in defining the boundaries of duty. In the latter situation, the court does not decide whether a particular plaintiff's injury was reasonably foreseeable in light of a particular defendant's conduct. Instead, its task is "to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party." (*Id.,* at pp. 572-573, fn. 6.)[2]

■ We must consider, then, whether as a matter of law defendants owed decedent a duty to warn under the facts alleged. ■■ Generally one has no duty either to control the conduct of another or to warn those endangered by that conduct. Thus "public entities and employees have no affirmative duty to warn of the release of an inmate with a violent history who has made *nonspecific threats of harm directed at nonspecific victims.*" (*Thompson* v. *County of Alameda, supra,* 27 Cal.3d at p. 754.)

An exception to that general rule exists when the defendant stands in some special relationship either to the dangerous person whose conduct

---

[2] "The jury, by contrast, considers 'foreseeability' in two more focused, fact-specific settings. First, the jury may consider the likelihood or foreseeability of injury in determining whether, in fact, the particular defendant's conduct was negligent in the first place. Second, foreseeability may be relevant to the jury's determination of whether the defendant's negligence was a proximate or legal cause of the plaintiff's injury." (*Ballard* v. *Uribe, supra,* 41 Cal.3d at pp. 572-573, fn. 6.)

needs to be controlled or to the reasonably foreseeable victim of that person's conduct. (*Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 435 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166] [special relationship between psychotherapist and patient who poses serious danger of violence may give rise to duty to warn patient's foreseeable victim].) ■ A duty to warn may also result from the voluntary act of a Good Samaritan. Liability may be imposed on a person who has no general duty to act, but who has voluntarily assumed a protective duty toward an individual and undertakes action on his or her behalf, thereby inducing reliance. (*Williams* v. *State of California* (1983) 34 Cal.3d 18, 23-24 [192 Cal.Rptr. 233, 664 P.2d 137].)

*Morgan* v. *County of Yuba* (1964) 230 Cal.App.2d 938 [41 Cal.Rptr. 508] is illustrative of a duty to warn voluntarily assumed. (See *Williams* v. *State of California, supra,* 34 Cal.3d at p. 24.) The complaint in *Morgan* alleged that a sheriff promised to warn the decedent if a prisoner who had made threats on her life was released, but did not do so. Reversing the trial court's dismissal of the action, the reviewing court held that if the decedent relied on that promise to her detriment, the county could be held liable for the failure to warn. (*Morgan, supra,* at pp. 943-946.)[3]

■ In the present case, plaintiffs' second amended complaint alleged that when Schlette was released from prison, defendants impliedly promised to share information obtained about him for the purpose of warning the threatened individuals, including Weissich. As for what was promised to Weissich himself, it was alleged that Weissich was assured by defendants that he would be "alerted to any threatening behavior on the part of Schlette to the extent such information was known." If the facts are as alleged, at the time of this 1975 meeting, defendants voluntarily assumed some protective duty toward Weissich. The critical issue here is not the origin of defendants' duty, but its scope and duration, as Weissich was not killed until 1986.

Plaintiffs argue that defendants' duty to Weissich was not affected by the passage of time. ■ ■ However, the duty of a Good Samaritan is of limited duration; a person who has performed a voluntary duty is not required to render aid indefinitely. (*Baker* v. *City of Los Angeles* (1986) 188 Cal.App.3d 902, 907 [233 Cal.Rptr. 760].) The relationship established by the voluntary act of a Good Samaritan is also limited; thus the voluntary

---

[3] *Morgan* has also been described by the Supreme Court as a case in which the defendants stood in a special relationship both to the victim and to the person whose conduct created the danger. (*Tarasoff* v. *Regents of University of California, supra,* 17 Cal.3d at p. 436, fn. 9, and accompanying text.)

conduct of one police officer may obligate that officer, but does not impose a duty of care on all other officers in the employing police department. (*Id.*, at p. 908.)

In *Baker*, one of the police officers who responded to a domestic dispute confiscated the husband's gun. After a similar call the next night, husband was arrested, convicted of assault, and placed on probation, on condition that he not possess a dangerous weapon. Another officer who was following established procedures returned the gun to husband. After yet another domestic dispute, husband shot wife. She sued the city and others, alleging in part that the officers were negligent in returning the gun to husband, but the court held that no duty existed under the facts. It reasoned in part that although the officer who initially confiscated the gun voluntarily entered into a special relationship with wife for the limited purpose of protecting her from harm at that moment, he did not become a guarantor of her future safety. Absent an express or implied promise to render additional aid, his duty ended when he took the gun from the home and left it at the police station. The court also reasoned that the special relationship established by one officer's voluntary act did not obligate the entire department. It noted that the public would be harmed by a rule that the voluntary act of one police officer imposes a duty on all members of the employing agency, as that agency would undoubtedly then order its employees to do no more than the law required, thereby depriving the public of the help which considerate employees might otherwise be willing to give. (*Baker* v. *City of Los Angeles, supra,* 188 Cal.App.3d at pp. 907-908, and fn. 4.)

The duration and scope of a duty voluntarily assumed were also considered in *City of Santee* v. *County of San Diego* (1989) 211 Cal.App.3d 1006 [259 Cal.Rptr. 757]. Defendant city cross-complained against the county in a tort action involving an accident allegedly caused by malfunctioning streetlighting. The city alleged that county deputies patrolling the area were obligated to report light outages to the city because they had voluntarily done so in the past, thereby inducing the city's detrimental reliance and creating a special relationship for liability purposes. The appellate court disagreed. It held, "Past voluntary acts of assistance do not entitle the benefited party to 'detrimentally rely upon' the Good Samaritan officer to confer future benefits, at least in the absence of an express promise by the officer that future assistance will be forthcoming. While a Good Samaritan must use due care within the voluntary undertaking, he is not thereafter an indentured bodyguard to the victim who claims detrimentally to have relied on the volunteer for future assistance." (*Id.*, at p. 1017.)[4]

---

[4] The *Santee* court found support for its conclusion in a comment in the Restatement Second of Torts, which states, "The fact that the actor gratuitously starts in to aid another does

The *Santee* court also agreed with the *Baker* court that the discretionary, voluntary acts of one or a few officers do not obligate all others employed by the same agency. The court explained, "Thus, while the agency may be liable based on respondeat superior, it is the individual volunteer upon whom a duty may be imposed, not all employees of the agency. This distinction is sound. The volunteer can reasonably be expected to use due care once he has elected to provide aid to the victim. However, to expand the network of obligated Good Samaritans (who may be unaware of either the nature of the aid rendered or the identity of the beneficiary who received the aid) would result in imposing potential liability on entirely blameless individuals and/or agencies for nonfeasance merely because they are employed by the same agency which employs the Good Samaritan." (*City of Santee* v. *County of San Diego, supra,* 211 Cal.App.3d at pp. 1017-1018.)

We recognize that unlike *Baker* and *Santee,* this case does involve allegations that unnamed representatives of defendants impliedly promised future action. Nevertheless, no express promise of open ended duration is alleged. As we will explain, we have concluded that it would be unreasonable to interpret the implied promise by certain of defendants' representatives in 1975 as imposing a duty on defendants which obligated them in perpetuity to inform Weissich of Schlette's criminal conduct.

We have already emphasized that the foreseeability of a particular kind of harm is a highly significant factor in establishing duty. (*Ballard* v. *Uribe, supra,* 41 Cal.3d at pp. 572573, fn. 6; *Tarasoff* v. *Regents of University of California, supra,* 17 Cal.3d at p. 434.) That this tragic murder occurred indicates that at least a few individuals do harbor an everlasting desire for vengeance, but such persistence is fortunately rare. We do not consider it reasonably foreseeable that a convicted felon who has threatened those involved in his prosecution will wait for over 30 years after his conviction, including over 11 years after his release from prison, before attempting to carry out fatal revenge. The likelihood that a failure to keep a potential victim informed of a defendant's subsequent criminal conduct for that length of time will result in the death of the victim is not sufficiently great that liability should be imposed on defendants.

Other factors to be considered in deciding whether tort liability should be imposed include the closeness of the connection between the defendant's

---

not necessarily require him to continue his services. He is not required to continue them indefinitely, or even until he has done everything in his power to aid and protect the other. The actor may normally abandon his efforts at any time unless, by giving the aid, he has put the other in a worse position than he was in before the actor attempted to aid him." (Rest.2d Torts, § 323, com. c, at p. 137, quoted in *City of Santee* v. *County of San Diego, supra,* 211 Cal.App.3d at p. 1015.)

conduct and the injury suffered, the extent of the burden to the defendant, and the consequences to the community of imposing a duty. (*Rowland* v. *Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].) Notwithstanding the allegations that defendants knew of criminal activity by Schlette after his release from prison, plaintiffs do not allege either that defendants were aware of any threats made by Schlette against Weissich after 1977, or that Schlette actually made any such threats at any time after 1977. At the same time, the facts alleged indicate that Weissich was well aware that Schlette had plans for revenge which persisted throughout his 20-year prison sentence; as a result, Schlette's potential for violence must necessarily have been of concern to Weissich even absent any knowledge of Schlette's subsequent criminal conduct. For either or both reasons, the causal link between defendants' alleged failure to inform Weissich of Schlette's conduct after his release from prison and Weissich's 1986 murder is tenuous at best. Furthermore, the practical obstacles to imposing an open ended duty on all members of a police agency to the potential victims of a vengeful released felon are obvious and significant. Ordinary personnel changes alone would make the administration of any such extended and prolonged obligation extremely complicated and difficult, if not impossible. The burden on the community of imposing that duty would be substantial, as police agencies might well entirely forego any promises to warn rather than risk potential perpetual liability.

For these reasons, it would be unreasonable to hold that the 1975 promise to alert Weissich to Schlette's "threatening behavior" obligated defendants indefinitely to inform Weissich of any criminal conduct by Schlette. To decide this appeal, we need not precisely delineate the scope or temporal boundaries of defendants' duty. We hold only that under the facts alleged, the voluntary promise made by certain individuals in 1975 did not obligate defendants to contact Weissich eight years later, when Schlette was arrested, convicted, and sentenced by federal authorities, or at any time thereafter. Whatever the outer limits of defendants' duty may have been, the trial court did not err in concluding that under the facts alleged here, liability could not be imposed because any duty had long since expired.

*Duffy* v. *City of Oceanside* (1986) 179 Cal.App.3d 666 [224 Cal.Rptr. 879], relied on by plaintiffs, is inapposite. In that case, shortly after the city hired a parolee who had been in prison for rape and other crimes, another city employee reported that he had sexually harassed her. She was not warned about his background. Later, the two developed a friendly work and social relationship. Almost five years later, the parolee kidnapped the woman; the kidnap ultimately resulted in her death. The trial court concluded that the city owed no duty to the victim, but the appellate court reversed. First, it held that the city did not have a duty to warn all its female

employees when it hired the parolee. Next, the court held that because the victim had reported the sexual harassment, it was a question of fact whether the city acted reasonably in failing to alert her in some manner to the parolee's past conduct. Thus by implication, the court necessarily held that the city had some duty to the victim, and that a jury should decide whether the duty was breached.[5] (*Id.*, at pp. 673-675.) *Duffy* appears to be a case in which a duty was imposed because defendant, the city, stood in a special relationship both to the victim and the person whose conduct created the danger. (See *Tarasoff* v. *Regents of University of California, supra*, 17 Cal.3d at p. 436, fn. 9.) But whatever the merits of the *Duffy* court's duty analysis, nothing in that case is of relevance to the proposition advanced by plaintiffs here, i.e., that defendants' voluntarily assumed duty to Weissich was of indefinite duration.

## Negligent Misrepresentation

As we have explained, plaintiffs have submitted a third amended complaint, attempting to state a cause of action for negligent misrepresentation involving a risk of physical harm as defined in *Garcia* v. *Superior Court, supra*, 50 Cal.3d 728. Under *Garcia*, a plaintiff must allege: (1) the defendant had a duty to exercise reasonable care to the victim in giving the information; (2) the defendant gave false information to the victim with a degree of culpability at least equal to negligence; (3) the victim actually and reasonably relied on the alleged misrepresentation; and (4) the victim's reliance on the misrepresentation proximately caused his or her injury or death. (*Id.*, at pp. 734-737.)[6]

On the duty element, the court reasoned that one who volunteers to communicate information has a duty to use reasonable care in doing so. Explaining when false information has been given with a degree of culpability at least equal to negligence, the court cited section 311 of the Restatement Second of Torts. Under that section, negligence " . . . may consist of

---

[5] On the question of proximate cause, the *Duffy* court admitted that "serious questions of causation" were presented where the killing took place four and a half years after the warning allegedly should have been given, but concluded that those questions could not be resolved on demurrer. (*Duffy* v. *City of Oceanside, supra*, 179 Cal.App.3d at pp. 673-675.)

[6] The opinion was not unanimous. The dissenting and concurring justices were of the view that the majority had confused negligent misrepresentation resulting in physical injury, which is governed by the rules of simple negligence, with the distinct common law tort of negligent misrepresentation, which is related to fraud and deceit and must be pleaded with specificity. More specifically, they disagreed with the majority's conclusion that *reasonable* reliance is an element of the cause of action and stated that in a negligence cause of action, the reasonableness of a plaintiff's conduct is considered, if at all, under the doctrine of contributory or comparative negligence. (*Garcia* v. *Superior Court, supra*, 50 Cal.3d at pp. 744-762 (dis. & conc. opn. of Mosk, J.).) Presiding Justice White was assigned to participate in *Garcia*, and joined in the dissenting and concurring opinion.

failure to exercise reasonable care [¶] (a) in ascertaining the accuracy of the information, or [¶] (b) in the manner in which it is communicated." (*Garcia* v. *Superior Court, supra,* 50 Cal.3d at pp. 736-737.)

The allegations of misrepresentation or false information and negligence in plaintiffs' proposed third amended complaint are as follows: ". . . in 1975, after Schlette had served his full term, defendants did represent to Weissich that they would inform him promptly of any conduct by Schlette that posed a threat to his physical well-being . . . . Decedent reasonably believed *and it was implicit in such representation, that the mechanism was in place to implement same. In fact, no such procedures had been established and defendants were not in a position at the time the representation was made to carry it out.* [¶] . . . The manner in which said representation was communicated was negligent in that, unbeknownst to decedent, no procedures had been established or machinery created to assure that such intelligence could or would be promptly and accurately relayed to him so that he could take effective steps to protect himself from an attack by Schlette." (Italics added.)

Concerning reliance, the complaint alleges that Weissich "did actually and reasonably rely upon said representations to his detriment by failing to take effective steps to protect himself . . ."; it then alleges numerous steps which Weissich might have taken, among them instituting procedures to screen persons who sought to enter his law office, employing a bodyguard, consulting a security service, or moving away from the Bay Area until Schlette no longer posed a threat. The allegations of causation are that Weissich's "reliance on defendants' verbal representations and prior conduct . . . was a substantial factor in, and contributing proximate cause of . . ." his death.

First, we note that plaintiffs allege an *implied* misrepresentation. They claim that when defendants promised in 1975 to warn Weissich of threatening conduct by Schlette, it was implicit in that representation that the mechanism existed to carry out those warnings. Plaintiffs claim that the representation was false and negligently communicated, because no procedures for accurately and promptly relaying information about Schlette were in place.

*Garcia* did not discuss whether negligent misrepresentation resulting in physical harm may be based on an implied representation, and cases decided before *Garcia* indicate that an implied representation is insufficient. *Yanase* v. *Automobile Club of So. Cal.* (1989) 212 Cal.App.3d 468 [260 Cal.Rptr. 513] is illustrative. Plaintiffs in that case brought a wrongful death action against an auto club, after decedent was killed in the parking

lot of a motel listed in a tour book published by the club. The court held that plaintiffs' complaint did not allege facts sufficient to state a cause of action for negligent misrepresentation, because nothing in the tour book's listing amounted to a positive assertion concerning the safety of the motel's neighborhood. The court stated that a cause of action for negligent misrepresentation requires a positive assertion and does not apply to implied representations. (*Id.*, at pp. 472-473; see also *Huber, Hunt & Nichols, Inc.* v. *Moore* (1977) 67 Cal.App.3d 278, 303-304 [136 Cal.Rptr. 603] [court states in dictum that negligent misrepresentation cannot be based on implied representations].) Based on the foregoing authority, plaintiffs' new complaint is inadequate in that it alleges only an implied misrepresentation, not an affirmative or positive assertion of fact.

The new complaint also does not allege facts from which a jury could conclude that Weissich *reasonably* relied on defendants' alleged negligent misrepresentation to his detriment. Plaintiffs urge that the 1975 misrepresentation lulled Weissich into a false sense of security, so that he failed to take effective steps to protect himself. As already discussed, however, the facts alleged indicate that Weissich was aware that Schlette had plans for revenge which endured throughout his 20-year prison sentence; therefore Schlette's potential for violence would necessarily have been of concern to Weissich whether or not he had any knowledge of Schlette's conduct after his release from prison. Furthermore, ordinary personnel changes in defendants' law enforcement and other related agencies alone would make the administration of any extended obligation to warn almost impossible to carry out. For those reasons, even if Weissich believed that a mechanism existed to monitor Schlette's conduct in 1975 when he was first released from prison, it would have been unreasonable as a matter of law for Weissich to rely on the continued existence of any such mechanism to protect himself from Schlette for 11 years.

A strong argument can also be made that the complaint does not allege facts from which a jury could reasonably conclude that the alleged negligent misrepresentation was the proximate cause of Weissich's death. ▉ The time span between any alleged misconduct and the harm is among the factors to be considered in determining the existence of proximate cause. (*Balido* v. *Improved Machinery, Inc.* (1972) 29 Cal.App.3d 633, 642 [105 Cal.Rptr. 890], disapproved on other grounds in *Regents of University of California* v. *Hartford Acc. & Indem. Co.* (1978) 21 Cal.3d 624, 641-642 [147 Cal.Rptr. 486, 581 P.2d 197]; Rest.2d Torts, § 433.) Comment f to section 433 of the Restatement Second of Torts explains in pertinent part: "Experience has shown that where a great length of time has elapsed between the actor's negligence and harm to another, a great number of contributing factors may have operated, many of which may be difficult or impossible of actual proof. Where the time has been long, the effect of the

actor's conduct may thus become so attenuated as to be insignificant and unsubstantial as compared to the aggregate of the other factors which have contributed."

■ Ordinarily, proximate cause is a question of fact which cannot be decided as a matter of law from the allegations of a complaint. (*Hoyem* v. *Manhattan Beach City Sch. Dist.* (1978) 22 Cal.3d 508, 520 [150 Cal.Rptr. 1, 585 P.2d 851]; see *Garcia* v. *Superior Court, supra,* 50 Cal.3d at p. 737.) Consistent with that general rule, the court in *Balido* v. *Improved Machinery, Inc., supra,* 29 Cal.App.3d 633, a design defect case, held that the effect of a lapse of time on causation was a fact question. (*Id.,* at pp. 642-643 [15-year interval between design defect and injury]; see also *Osborn* v. *City of Whittier* (1951) 103 Cal.App.2d 609, 616 [230 P.2d 132].) Nevertheless, where the facts are such that the only reasonable conclusion is an absence of causation, the question is one of law, not of fact. (*Capolungo* v. *Bondi* (1986) 179 Cal.App.3d 346, 354 [224 Cal.Rptr. 326]; *Constance B.* v. *State of California* (1986) 178 Cal.App.3d 200, 207-208 [223 Cal.Rptr. 645]; *State of California* v. *Superior Court* (1984) 150 Cal.App.3d 848, 858-860 [197 Cal.Rptr. 914]; *Balido* v. *Improved Machinery, Inc., supra,* 29 Cal.App.3d at p. 644 [recognizing that in extreme cases, passage of time may create such high probability of superseding causation that absence of proximate cause is determined as a matter of law]; see Rest.2d Torts, § 434.)

In *Duffy* v. *City of Oceanside, supra,* 179 Cal.App.3d 666, a duty-to-warn case, the court stated that "serious questions of causation" were presented where a killing took place four and a half years after a warning allegedly should have been given, but concluded that the question could not be resolved on demurrer. (*Id.,* at p. 674.) Even more serious questions of causation are present here, where over 11 years elapsed between the alleged negligent misrepresentation and Weissich's death, and this may well be that exceptional case where the absence of proximate cause can be determined as a matter of law. Nevertheless, as we have already concluded that plaintiffs' proposed allegations of misrepresentation and reasonable reliance are deficient, we need not resolve the proximate cause question.

*Civil Rights Violation*

Against defendants Marin and Sonoma, plaintiffs' complaint also alleged a violation of Weissich's civil rights under section 1983. Plaintiffs alleged that defendants were grossly negligent and acted with deliberate indifference in disregard of California law imposing the duty to warn. ■ However, the State's failure to prevent harm inflicted by a private actor does not give rise to a cause of action under section 1983, with one possible exception, i.e., when the State has physically limited the victim's

ability to act on his own behalf to protect himself and has left him in a worse position than before the State acted. (*Garcia* v. *Superior Court, supra,* 50 Cal.3d at p. 739, citing *DeShaney* v. *Winnebago County DSS* (1989) 489 U.S. 189 [103 L.Ed.2d 249, 109 S.Ct. 998].) Given that authority, plaintiffs have abandoned their attempt to state a section 1983 cause.

### Workers' Compensation Award

At defendant Marin's request, we have taken judicial notice that plaintiff Rosemary Weissich, decedent's spouse, has received an award of workers' compensation benefits from Marin on the basis of decedent's employment as district attorney in 1955 at the time of Schlette's arson prosecution. Marin argues that because Weissich's death was compensated under the Workers' Compensation Act, the tort action against Marin must be dismissed. (See Lab. Code, § 3602; *Marsh & McLennan, Inc.* v. *Superior Court* (1989) 49 Cal.3d 1, 5 [259 Cal.Rptr. 733, 774 P.2d 762]; *Soil Engineering Construction, Inc.* v. *Superior Court* (1982) 136 Cal.App.3d 329, 332-333 [186 Cal.Rptr. 209].) However, because we have concluded that plaintiffs have failed to state any tort cause of action, it is unnecessary to consider this argument.

### Disposition

The judgment is affirmed.

White, P. J., and Merrill, J., concurred.

A petition for a rehearing was denied November 26, 1990, and appellants' petition for review by the Supreme Court was denied January 30, 1991.